INTERGRAPH CORPORATION,
Plaintiff–Appellant,

v.

INTEL CORPORATION,
Defendant–Appellee.

No. 00–1048.

United States Court of Appeals,
Federal Circuit.

March 1, 2001.

Rehearing Denied April 9, 2001.

·John G. Roberts, Jr., Hogan & Hartson L.L.P., of Washington, DC, argued for plaintiff-appellant. With him on the brief were Jonathan S. Franklin and Corey W. Roush. Of counsel on the brief were David Vance Lucas, Senior Counsel, Intergraph Corporation, of Huntsville, Alabama; and William L. Jaeger and Richard L. Grossman, Townsend and Townsend and Crew LLP, of San Francisco, California.

Joel M. Freed, Howrey & Simon, of Washington, DC, argued for defendant-appellee. With him on the brief were Celine T. Callahan and Cecil E. Key. Of counsel on the brief were Peter N. Detkin and Thomas C. Reynolds, Intel Corporation, of Santa Clara, California. Of counsel was Mark I. Levy, Howrey & Simon, of Washington, DC.

Before NEWMAN, RADER, and GAJARSA, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Intergraph Corporation appeals the decision of the United States District Court for the Northern District of Alabama,[1] granting summary judgment that Intel Corporation is licensed to practice the inventions of Intergraph's United States Patents Nos. 4,860,192, 4,884,197, 4,933,-835, and 5,091,846 (together "the Clipper patents"), and dismissing Intergraph's claims for patent infringement. We conclude that Intel is not licensed under these patents.

---

1. *Intergraph Corp. v. Intel Corp.,* No. CV–9–N– 3023–NE (N.D.Ala. Oct. 12, 1999).

## BACKGROUND

The Clipper patents relate to certain microprocessor technology developed by the Advanced Processor Division of Fairchild Semiconductor Corporation. Intergraph, a manufacturer of computer graphics workstations, used the Clipper technology in its workstations. In 1987, when Intergraph learned that Fairchild was to be sold by its parent company to National Semiconductor Company, Intergraph arranged to purchase the Advanced Processor Division from Fairchild, including the Clipper technology and pending patent applications. Intergraph, National Semiconductor, and Fairchild entered into a Purchase Agreement dated September 30, 1987, referring to National's forthcoming purchase of Fairchild and providing that National will, at the closing, "cause Fairchild to sell, assign, transfer, convey and deliver to Intergraph" all of the assets of the Advanced Processor Division. The agreement defines Fairchild as "Seller" of these assets, and sets forth the documents to be delivered to Intergraph at the closing, including assignment of the Clipper applications.

At the closing on October 8, 1987 these transactions were all carried out. National acquired Fairchild, which became a subsidiary of National; and the Advanced Processor Division was conveyed to Intergraph, including assignment of the Clipper patent applications from Fairchild to Intergraph. Since the Fairchild officers had resigned earlier in the day, the patent assignment documents were executed on behalf of Fairchild by Lawrence Ludgus, who was designated by National to act as attorney-in-fact for Fairchild. The question is whether, in the course of these proceedings, the Clipper patent applications and the patents granted to Intergraph thereon became included in the existing cross-license agreement between National Semiconductor and Intel. The district court so held.

The issue may be resolved upon review of the various contracts: the cross-license agreement between National and Intel, and the documents showing the intent as well as the implementation among Fairchild, Intergraph, and National. *See, e.g., United States v. Winstar Corp.,* 518 U.S. 839, 911, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("Under ordinary principles of contract law, one would construe the contract in terms of the parties' intent, as revealed by language and circumstance."); *The Binghamton Bridge,* 70 U.S. (3 Wall.) 51, 74, 18 L.Ed. 137 (1865) ("All contracts are to be construed to accomplish the intention of the parties."); *Foster–Gardner, Inc. v. National Union Fire Ins. Co.,* 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265, 272 (Cal.1998) ("The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.")[2]

The cross-license agreement between National Semiconductor and Intel, entered in 1976 and in effect at the time of these events, provides that National grants to Intel

> non-exclusive, non-transferrable, royalty-free, world-wide licenses under NATIONAL PATENTS and NATIONAL PATENT APPLICATIONS to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS.

It is *not* disputed that the general subject matter of the Clipper patent applications is within the technological scope of "Licensed Products" as defined in the cross-license agreement. That agreement includes the following definitions:

> "NATIONAL PATENTS" means all classes or types of patents . . . in respect of which, as of the EFFECTIVE DATE, or thereafter during the term of this Agreement, NATIONAL owns or controls, or under which and to the extent to which and subject to the conditions under which NATIONAL may have, as

---

**2.** The National–Intel cross-license agreement provides that it is to be interpreted under California law.

of the EFFECTIVE DATE, or may thereafter during the term of this Agreement acquire, the right to grant licenses of the scope granted herein without the payment of royalties or other consideration to third persons, ... "NATIONAL PATENT APPLICATIONS" means any applications ... which, when issued, will become NATIONAL PATENTS.

The district court held that the Clipper patent applications were "National Patent Applications" because "National Semiconductor Corporation did, in fact, acquire 'control' of the subject patents within the meaning of the cross-licensing agreement between itself and Intel Corporation dated June 1, 1976, and that Intel was then and is now licensed to use such patents as set out in the cross-licensing agreement."

Challenging the correctness of this ruling, Intergraph presents three principal arguments: first, that the Clipper patent applications were not within the license agreement's definition of "National Patent Applications" because they would not, when issued, become "National Patents"; second, that the events of the closing did not give National "ownership or control" of the patents that later issued on the Clipper patent applications; and third, that in all events no license was available to Intel because the agreement requires consent by any subsidiary before its patents are included in the cross-license. Thus Intergraph argues that no license to Intel vested during the procedures of the closing.

## DISCUSSION

The cross-license agreement between National and Intel defines "National Patent Applications" as any applications "which, when issued, will become National Patents." "National Patents" are defined as all patents that "during the term of this Agreement, NATIONAL owns or controls...." Since the Clipper patent applications were assigned by Fairchild directly to Intergraph, they could not issue as patents owned or controlled by National. The plain reading of the license definition of "National Patent Applications" is patent applications that *will* become "National Patents." The term "ownership or control" in the Intel cross-license agreement applies not to "National Patent Applications" but to "National Patents." The license agreement requires that the patent application, when issued, will become a patent that National owns or controls. As this provision was not met, and was plainly not intended to be met, the Clipper patent applications did not meet the definition of "National Patent Applications," even fleetingly on the day of the closing.

National was obligated to assure that the Advanced Processor Division, including the Clipper patent applications, were transferred from Fairchild to Intergraph "concurrently with or immediately following the acquisition of Fairchild." This obligation, and its performance, did not convert these patent applications into "National Patent Applications" with the right to encumber the later-issued Clipper patents with a third party royalty-free license. At the closing the paperwork for National's acquisition of Fairchild was completed first, followed by completion of the paperwork for Intergraph's acquisition of the Advanced Processor Division. Intel states that this placed the Clipper patent applications within the ownership or control of National for an hour or two. Intel also argues that National was a "party" to the sale by Fairchild to Intergraph, based on National's agreement "to cause Fairchild" to perform this transfer at the closing.

The transfers of Fairchild to National and of the Advanced Processor Division to Intergraph were conducted in sequence on the same day. The order of proceedings did not vest National with the right to encumber any property that it momentarily possessed until the next document was signed. Intel's citation of cases whereby the sole shareholder of a corporation may dispose of corporate property does not establish that National had the right, for an hour or two, to encumber the Advanced Processor Division and its patent property

in a way that would contravene the terms of the sale to Intergraph. In the assignment by Fairchild to Intergraph there is transferred "the full and exclusive right, title and interest to the Clipper patent applications," without hint that unknown persons might acquire a free license from National during the hour of closing. Intel's contrary interpretation of these documents is too strained to be supported. *See General Casualty Co. of America v. Azteca Films, Inc.*, 278 F.2d 161, 169 (9th Cir. 1960) ("Reaching a strained interpretation of a contract is tantamount to rewriting the contract. This the court cannot do.")

No contract or other document, and no other evidence, supports the interpretation that Fairchild, Intergraph, and National intended that the Advanced Processor Division and its patent applications could be encumbered by National before the transfer to Intergraph was completed. The Purchase Agreement, dated a week before the closing, provides that National will cause Fairchild to sell the Advanced Processor Division assets directly to Intergraph, free and clear of all encumbrances not assumed by Intergraph:

> Such sale, conveyance, transfer and delivery of the [Advanced Processor Division] assets defined above shall be free and clear of all debts, liabilities, obligations, title defects, liens and encumbrances, except for those expressly assumed by Intergraph.

This transaction was required to occur "concurrently with or immediately following the acquisition of Fairchild by National." Intergraph did not "expressly assume" that National's cross-licensees would be granted free licenses to the Clipper patent applications and ensuing patents based on the sequential mechanics of the closing. The district court erred in construing these events as giving National "ownership or control" of the patents that issued some years later to Intergraph.

In further support of its position that Intel did not acquire a license to the Clipper patents, Intergraph points out that Fairchild became a subsidiary of National, and that the National–Intel cross-license agreement provides that the patents and applications of the parties' subsidiaries are not included in the cross-license agreement unless the subsidiary expressly agrees to include them in exchange for a license to the Intel patents:

> § 2. INTEL agrees that NATIONAL shall have the right to extend the licenses granted pursuant to section 1 hereof only to those of its SUBSIDIARIES which will agree to include their patents, utility models, and design patents and applications therefor covering LICENSED PRODUCTS in NATIONAL PATENTS and NATIONAL PATENT APPLICATIONS.

It is undisputed that Fairchild did not agree to include the Clipper patent applications in the cross-license agreement. Indeed Fairchild, when it became National's subsidiary, could not agree to include the Clipper patent applications in the cross-license agreement, for Fairchild had sold these applications to Intergraph exclusively and free of encumbrances.

Intel proposes an alternative reading of this contract provision, and argues that it does not exclude all patents owned by National's subsidiaries unless they elect to join the cross-license agreement, but instead provides a means whereby a subsidiary whose patents are not controlled by National may choose to enjoy the benefits of a cross-license with Intel. We discern no support for Intel's theory that this clause means that a subsidiary's patents are necessarily licensed to Intel without the subsidiary's consent, or is intended to apply only to those subsidiaries over which Intel lacks control. The cross-license agreement defines "subsidiary" as an entity at least fifty percent of whose stock is owned or controlled by a party to the agreement. Since such a subsidiary is by this definition within National's "control," yet this clause requires the subsidiary's agreement to the cross-license, there is no merit to Intel's position that the Fairchild

subsidiary's patents became licensed to Intel even if the subsidiary did not agree.

## CONCLUSION

The district court erred in ruling that Intel is licensed under the Clipper patents. That ruling is reversed. The case is remanded for appropriate further proceedings.

*REVERSED AND REMANDED.*