# United States Court of Appeals for the Federal Circuit

---

**INTEL CORPORATION,**
*Plaintiff-Appellee,*

**v.**

**NEGOTIATED DATA SOLUTIONS, INC.,**
*Defendant-Appellant,*

AND

**ASUS COMPUTER INTERNATIONAL, INC.,
ACER AMERICA CORPORATION, ACER, INC.,
LENOVO GROUP LTD., AND LENOVO, INC.,**
*Defendants.*

---

2011-1448

---

Appeal from the United States District Court for the Eastern District of Texas in Nos. 08-CV-0319 and 11-CV-0247, Chief Judge David J. Folsom.

---

Decided: December 17, 2012

---

GARLAND STEPHENS, Fish & Richardson, P.C., of Houston, Texas, argued for plaintiff-appellee. With him

on the brief were JOHN A. DRAGSETH and DEANNA J. REICHEL, of Minneapolis, Minnesota.

JOEL L.THOLLANDER, McKool Smith, P.C. of Austin, Texas, argued for defendant-appellant.  With him on the brief were THEODORE STEVENSON, III and DAVID SOCHIA of Dallas, Texas.

---

Before PROST, LINN,[*] and WALLACH, *Circuit Judges*.

LINN, *Circuit Judge*.

Negotiated Data Solutions, Inc. ("N-Data") appeals from the district court's grant of summary judgment of license and noninfringement in favor of Intel Corp. ("Intel").  *Intel Corp. v. Negotiated Data Solutions, LLC*, No. 2:11-cv-247 (E.D. Tx. May 9, 2011).  Because Intel is licensed to practice the patents-in-suit pursuant to a licensing agreement with N-Data's predecessor in interest, National Semiconductor Corp. ("National"), this court affirms.

## I. BACKGROUND

By the 1970s both Intel and National were actively developing semiconductor technology.  On June 1, 1976, Intel and National entered into a patent cross-licensing agreement.  Agreement between Intel Corp. and National Semiconductor Corp. (June 8, 1976) (J.A. 284) ("National Agreement" or "Agreement").  The Agreement gave Intel "non-exclusive, non-transferrable, royalty-free, world-wide licenses under NATIONAL PATENTS and NATIONAL PATENT APPLICATIONS to make, to have made, to use, to sell (either directly or indirectly), to lease and to other-

---

[*]    Circuit Judge Linn assumed senior status on November 1, 2012.

wise dispose of LICENSED PRODUCTS," *id.* at 5, for the life or lives of the patents, *id.* at 7. The Agreement defined "NATIONAL PATENTS" ("National Patents") as:

> all classes or types of patents and utility models of all countries of the world, applications for which have a first effective filing date in any country prior to the date of expiration or termination of this Agreement, in respect of which, as of the EFFECTIVE DATE, or thereafter during the term of this Agreement, NATIONAL owns or controls . . . [or has] the right to grant licenses of the scope granted herein . . . .

*Id.* at 2–3. The Agreement gave National similar rights in Intel's patents. The parties extended the five year agreement three times, finally allowing it to expire on December 31, 2003.

In 1998, National assigned U.S. Patents No. 5,361,261 ("'261 Patent"), No. 5,533,018 ("'018 Patent"), No. 5,566,169 ("'169 Patent"), No. 5,594,734 ("'734 Patent") (collectively the "Original Patents"), and others to Vertical Networks, Inc. ("Vertical"), a corporation consisting partially of former National engineers. Each one of the Original Patents was indisputably a National Patent under the Agreement. Then between 1998 and 1999 Vertical filed broadening reissue applications with the United States Patent and Trademark Office ("PTO") for the latter three of the Original Patents. In filing these reissue applications, Vertical increased the total number of claims in the three patents from 77 to 378. In 2003 and 2005, Vertical assigned the Original Patents and their corresponding reissue applications to N-Data. In 2005 and 2006, well after the Agreement had expired, the PTO issued to N-Data U.S. Reissue Patents RE38,820 ("RE'820 Patent"), RE39,216 ("RE'216 Patent"), and RE39,395 ("RE'395 Patent") (collectively the "Reissue Patents")

corresponding to the '018, '734, and '169 Patents, respectively.

On December 13, 2006, N-Data sued Dell, Inc. ("Dell"), one of Intel's customers, in the United States District Court for the Eastern District of Texas, alleging infringement of several patents, including the Reissue Patents. Complaint at 2–5, *Negotiated Data Solutions v. Dell, Inc.*, 2:06-cv-528 (E.D. Tx. July 13, 2009) ("*Dell*"), ECF No. 1. Intel intervened in N-Data's suit against Dell. On August 15, 2008, Intel filed a complaint seeking a declaratory judgment that under the National Agreement Intel and its customers are licensed to the National Patents and all reissue patents owned by N-Data that are derived from any of the National Patents. *Intel Corp. v. Negotiated Data Solutions, LLC*, No. 2:08-cv-319 (E.D. Tx. Mar. 18, 2010). N-Data counterclaimed alleging infringement against Intel and other Intel customers. Dell and N-Data ultimately settled, leaving Intel's declaratory judgment action and N-Data's counterclaim against Intel pending. Agreed Order of Dismissal with Prejudice, *Dell*, ECF No. 250.

The parties filed cross-motions for summary judgment: Intel sought a declaration of non-infringement of all claims based on its license, and N-Data sought summary judgment of non-license of the newly issued claims of the three Reissue Patents. While Intel argued that the Agreement naturally extends to reissue patents that derive from National Patents, N-Data argued that the Reissue Patents are separate patents that cover unique property rights distinct from the rights covered by the Original Patents. According to N-Data, because the Reissue Patents were issued directly to N-Data after the Agreement had expired, they are not National Patents and are not licensed to Intel. In support of its argument, N-Data looked to *Intergraph Corp. v. Intel Corp.*, 241 F.3d 1353 (Fed. Cir. 2001). In *Intergraph*, this court examined

the National Agreement and held that patent applications momentarily possessed by National as part of an acquisition and subsequent sale of a subsidiary company did not become National Patents subject to license simply by virtue of that transaction. 241 F.3d at 1356. N-Data also cited *Altvater v. Freeman*, 319 U.S. 359 (1943), which it reads as foreclosing the possibility that a contract to an original patent automatically extends to subsequent reissues of that patent.

The district court distilled the parties' dispute in this case to a single issue: "under the [National] Agreement, should the reissued patents *be treated as* 'National Patents.'" Memorandum Opinion and Order at 3, *Intel Corp. v. Negotiated Data Solutions, LLC*, No. 2:08-cv-319 (E.D. Tx. Mar. 18, 2010), ECF No. 137 ("*Opinion*") (emphasis added). The district court agreed with Intel, finding that the intent of the contracting parties was "to grant broad rights to all patents owned or controlled by the other party for the life of the patents . . . and avoid future infringement suits." *Id.* at 4 (citing Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting . . . .")). The district court found that N-Data's interpretation would allow a party to effectively revoke the Agreement by putting a patent into broadening reissue, thus defeating the parties' intent when they formed the Agreement. *Id.*

In the district court's view, *Intergraph* was not controlling because it dealt only with determining when certain patent applications should be considered National Patent Applications that are covered by the Agreement. That case did not answer the question of whether the reissue of a National Patent is "effectively" a National Patent under the Agreement. *Opinion* at 6. The district court also distinguished *Altvater*, concluding that, despite some language facially supporting N-Data's position,

*Altvater* turned on whether there was offer and acceptance of a new license to the reissue patent at issue there. *Id.* at 6–7. The district court ultimately found for Intel, holding that the National Agreement "applies to all four patents-in-suit" and "protects Intel against claims of direct infringement as well as allegations of indirect infringement based upon sales by third parties incorporating Intel products." *Id.* at 8. The district court then severed the N-Data/Intel claims from the claims against other of Intel's customers and entered final judgment for Intel. *Intel Corp. v. Negotiated Data Solutions, LLC*, No. 2:11-cv-247 (E.D. Tx. May 9, 2011), ECF No. 2. N-Data timely appealed. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Standard of Review

"We review *de novo* the district court's grant of summary judgment, drawing all reasonable inferences in favor of the nonmovant." *Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1295 (Fed. Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary Judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247–48.

The National Agreement is governed by California law, "under which the district court's interpretation . . . presents a question of law that we review de novo." *Alfred E. Mann Found. For Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010) (citing *DVD Copy Control Ass'n v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 713 (Ct. App. 2009)).

## B. Analysis

The parties here ask this court to determine whether the National Agreement, which licenses National Patents to Intel, automatically extends to any reissue patents that are derived from those licensed National Patents.

### 1. 35 U.S.C. § 252

N-Data contends that 35 U.S.C. § 252 as a whole defines a nuanced arrangement where only substantially identical claims reach back to the date of the original patent and argues that the Agreement expressly covers only patents owned or controlled by National during the term of the license. *See Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 827 (Fed. Cir. 1984). Thus, according to N-Data, while the Agreement covered the Original Patents, it does not cover the Reissue Patents, which were each issued directly to N-Data after the Agreement had expired. *See Intergraph*, 241 F.3d at 1355. According to N-Data, "upon surrender at reissue, '[t]he original claims are dead,'" Appellant's Br. 27 (alteration in original) (quoting *Seattle Box*, 731 F.2d at 827), and the resulting reissue patent is a distinct property right that does not simply replace the original patent in an existing agreement. *See Altvater*, 319 U.S. at 360; *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 856 (Fed. Cir. 1999); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636–38 (Fed. Cir. 1991).

Intel, however, focuses on § 252's language that "every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form." According to Intel, when a cause of action arises after reissue, § 252 provides that the reissue patent takes the place of the original patent *nunc pro tunc*, as if the reissued patent had been issued at the time

of, and instead of, the original. *See* 35 U.S.C. § 252. Intel points to language nearly identical to this portion of § 252 in the statutes governing certificates of correction, 35 U.S.C. §§ 254 and 255, and argues that this court has held that in that context, this same language indicates that the corrected patent replaces the original *nunc pro tunc. Sw. Software, Inc. v. Harlequin, Inc.*, 226 F.3d 1280, 1295 (Fed. Cir. 2000). Thus, under Intel's reading of § 252, the Reissue Patents should be treated as the Original Patents; because the Original Patents were indisputably licensed to Intel, the Reissue Patents are licensed as well.

Intel's focus on selected portions of the text of § 252 ignores the specific language of the statute that grants intervening rights to those who may infringe only new claims added by reissue. In this important aspect alone, it is clear that a reissue patent does not simply replace an original patent *nunc pro tunc. See Spectronics*, 940 F.2d at 637–38. Intel's argument also fails to recognize that certificates of correction are not generally available to change the scope of coverage of a patent in the same way as a reissue, are not intended to remedy the same kinds of defects, and have different standards in implementation. Intel's attempt to draw parallels between § 252 and the statutes governing certificates of correction thus falls short.

At bottom, the scheme set forth in § 252 does not support Intel's simplistic proposition that a reissue patent replaces the original patent *nunc pro tunc.* The question remains, however, whether the National Agreement itself is properly interpreted, under California law, to extend the license granted thereunder to the Reissue Patents.

## 2. The Agreement

N-Data's primary argument is quite straightforward: the Agreement only covers National Patents, National Patents are patents that issued directly to National during the term of the Agreement, the Reissue Patents issued directly to N-Data after the Agreement had expired, and thus, the Reissue Patents are not covered by the grant in the Agreement. N-Data further contends that California law requires that the Agreement be interpreted in light of the parties' intent while contracting, and "the parties' general intent must be informed and limited by the particular provisions of the National License." Appellant's Br. 14. N-Data argues that the district court erred by discounting *Intergraph*'s interpretation of the National Agreement and *Altvater*'s proscription on rewriting a private contract to include a patent that did not exist at the time the parties formed the contract. N-Data also points to 35 U.S.C. § 261, which makes any interest in a patent assignable, and *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995), to argue that National's interest in any potential reissue patents could have been licensed by contract, but here, was not. Finally, N-Data disagrees with the district court's conclusion that excluding reissue patents from licenses like the Agreement will allow for manipulation of the parties' intentions; here N-Data's Reissue Patents are broader than the Original Patents, and Intel therefore never had any rights under the new reissue claims. Thus, there is no way N-Data's conduct manipulates the system.

Intel agrees that under California law, a contract must be interpreted to give effect to the parties' mutual intent. *See* Cal. Civ. Code § 1636. Intel contends, however, that in order to realize the parties' intention to avoid future patent infringement litigation, the Agreement broadly licensed all of National's patent rights; the Agreement did not license specific claims of any patents.

Instead, the reissued patent covers "the" licensed invention from "the" original patent. *See* Oral Arg. at 22:55–23:50, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2011-1448/all/intel.html. Thus, according to Intel, the district court correctly interpreted the contract as granting Intel a license to not only original patents, but also to any reissue patents that were derived therefrom and were directed to the inventions disclosed therein.

As the district court correctly noted, the key question in this case is not whether the Reissue Patents *are* National Patents under the definition set forth in the Agreement, but whether the Agreement evinces an intent on the part of the parties that Reissue Patents *should be treated as* National Patents under the Agreement. In this regard *Intergraph* is inapposite—that case only dealt with whether or not the National Agreement covered patent applications held momentarily by National as part of a corporate transaction in which a subsidiary possessed the applications but then immediately sold them, such that the applications never issued as National Patents. *See Intergraph*, 241 F.3d at 1355–56.

Nor does *Altvater* compel the conclusion that the Reissue Patents are not covered by the National Agreement. 319 U.S. 359. The issue that the Supreme Court considered in *Altvater* was whether there was a controversy between the parties when the district court found that there was not a valid license between the parties. 319 U.S. at 364–66. The language facially supporting N-Data's position is a restatement of the district court's findings, not a holding of the Supreme Court. The Court in *Altvater* was not deciding whether the license agreement between the parties terminated *because of* surrender and reissue. *Id.* at 362, 364. *Altvater* cannot mean that reissue of certain National Patents terminates the National Agreement; *Altvater* has no bearing on whether

the National Agreement grants to Intel rights to reissue patents derived from National Patents and it does not compel adoption of the sweeping rule N-Data derives from it.

Section 251, which at the time the Agreement was signed provided in relevant part:

> [w]henever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent . . . reissue *the patent for the invention disclosed in the original patent*, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. *No new matter shall be introduced into the application for reissue.*

35 U.S.C. § 251 (1976) (emphasis added).

Section 251 does not refer to issuance of "a" reissue patent for "an" invention; it specifically refers to reissue of "the" inoperative or invalid patent for "the" invention disclosed in the original patent. 35 U.S.C. § 251. The statute prohibits addition of new matter via reissue and indicates that "the" reissued patent will be effective for the remainder of the unexpired term of the original patent. *Id.* Thus, the text of § 251 suggests to a potential licensee that—in the absence of contrary language in the licensing agreement—a license under the patent that is not directed to any specific claims, field of use, or other limited right will extend to the full extent of protection provided by law to the invention which is the subject of that patent. Because the patent laws provide for the grant of reissue patents under specified circumstances, it

is reasonable to conclude that the parties' mutual intent at the time of contracting was that the broad and unrestricted grant of license under National Patents extended to any reissues thereof.

This court's decisions in *TransCore v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009), and *General Protecht Group, Inc. v. Leviton Manufacturing Co.*, 651 F.3d 1355 (Fed. Cir. 2011), while not controlling, lend support to the interpretation made by the district court and affirmed by us here. In both of those cases this court analyzed a licensee's rights when the patent holder received a continuation patent that, if asserted against the licensee, would derogate from the licensee's right to practice the previously licensed patents.

Specifically, in *General Protecht* we observed that "the newly asserted continuations are based on the same disclosure as the previously licensed patents and that, by definition, *the continuations can claim no new invention not already supported in the earlier issued patents*." 651 F.3d at 1361 (emphasis added). The "same inventive subject matter was disclosed" in the continuation patents as in the licensed patents, and "[i]f Leviton did not intend its license of these products to extend to claims presented in continuation patents, it had an obligation to make that clear." *Id.*

*TransCore* and *General Protecht* recognized that allowing the patent holder to sue on subsequent patents, when those later patents contain the same inventive subject matter that was licensed, risks derogating rights for which the licensee had paid consideration. In situations where the full extent of an invention disclosed in a patent is licensed, the concerns raised in *General Protecht* and *TransCore* are equally relevant, regardless of whether the case involves reissue patents or continuation patents.

N-Data repeatedly argues that "it has made and will make no assertion of infringement based on reissue claims that existed in any form prior to 2005," Appellant's Br. 9, thus there is no chance that N-Data will derogate from Intel's bargained for rights under the National Agreement. As support, N-Data cites to its counterclaim, where it alleged that Intel's acts exceed the scope of its license coverage, and to its motion for summary judgment of non-infringement of newly issued claims of the Reissue Patents. Intel disagrees, stating that N-Data has broadly asserted the Reissue Patents, including claims that were not new claims specific to the Reissue Patents. Appellee's Br. 9 ("N-Data asserted . . . original claims of the reissued patents (e.g., RE39,395 claims 1, 3, 7 and 14, RE39,216 claim 15, and RE38,820 claims 8, 30, 34) . . . ."). Ultimately it is irrelevant which claims were asserted and when they were asserted. The district court granted summary judgment to Intel because the Agreement reflects the intent of the parties to license not only the literally described patents and patent applications, but also the reissue progeny of those licensed patents and patent applications from which the reissues were derived. This court agrees.

The National Agreement does not explicitly discuss reissue patents, but the grant of license under the National Patents is without limitation and without reference to any specific claims. The Agreement thus evinces the parties' intent that the license so granted extend not only to the claims then in existence but also to the full scope of any coverage available by way of reissue for the invention disclosed. To interpret the Agreement otherwise would allow the unilateral act of the licensor to place the licensee, which sought to eliminate any infringement risk and effect a global peace with the licensor for all claims in all patents, in a position of being exposed to further risk relating to the exact same inventions that were subject to the license. 35 U.S.C. § 261 is not inconsistent with this

conclusion. That a patent owner has the ability to assign (or reserve) any interest in its patent says nothing about interpreting a contract that does not expressly discuss that interest.

CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED**