# United States Court of Appeals for the Federal Circuit

2008-1430

TRANSCORE, LP and TC LICENSE, LTD.,

Plaintiffs-Appellants,

v.

ELECTRONIC TRANSACTION CONSULTANTS CORPORATION,

Defendant-Appellee.


William J. Robinson, Foley & Lardner LLP, of Los Angeles, California, argued for plaintiffs-appellants.  With him on the brief was Grant E. Kinsel.

John R. Emerson, Haynes and Boone, LLP, of Dallas, Texas, argued for defendant-appellee.  With him on the brief were Phillip B. Philbin, Jacob G. Hodges, and William D. White.

Appealed from:  United States District Court for the Northern District of Texas

Judge James Edgar Kinkeade

# United States Court of Appeals for the Federal Circuit

2008-1430

TRANSCORE, LP and TC LICENSE, LTD.,

Plaintiffs-Appellants,

v.

ELECTRONIC TRANSACTION CONSULTANTS CORPORATION,

Defendant-Appellee.

Appeal from the United States District Court for the Northern District of Texas in Case No. 3:05-CV-2316, Judge James Edgar Kinkeade.

_____

DECIDED: April 8, 2009

_____

Before GAJARSA, DYK, and MOORE, Circuit Judges.

GAJARSA, Circuit Judge.

TransCore, LP and TC License, Ltd. (collectively "TransCore") appeal from a final judgment of the U.S. District Court for the Northern District of Texas that was entered upon the district court's grant of summary judgment. See Transcore, LP v. Electronic Transaction Consultants Corp., No. 3:05-CV-2316-K, 2008 WL 2152027 (N.D. Tex. May 22, 2008). Specifically, the District Court found that TransCore's patent infringement claims against Electronic Transaction Consultants Corp. ("ETC") were barred by patent

exhaustion, implied license and legal estoppel, in view of a settlement agreement between TransCore and the supplier of the products ETC installed, Mark IV. Because we agree with the district court and find that Mark IV's sales were authorized and exhausted TransCore's patent rights, thus barring TransCore's claims against ETC, we affirm.

## BACKGROUND

TransCore is engaged in the manufacture, sale and installation of automated toll collection systems—the tags and readers that communicate as a vehicle passes through an automated toll plaza (e.g., E-ZPass). TransCore is the assignee of several patents to related technologies.

In 2000, TransCore sued a competitor, Mark IV Industries, for infringement of several TransCore patents. That action was resolved by a settlement agreement, in which Mark IV agreed to pay $4.5M in exchange for an unconditional covenant not to sue and a release of all existing claims. The covenant and release, which are central to the dispute here, read:

> 3. In exchange for the payment set forth in paragraph 1, TCI hereby agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement of any of United States Patent Nos. 5,805,082; 5,289,183; 5,406,275; 5,144,553; 5,086,389; 5,751,973; 5,347,274; 5,351,187; 5,253,162; and 4,303,904, or any foreign counterparts of the aforesaid United States Patents, for the entire remainder of the terms of the respective United States Patents and their foreign counterparts. This Covenant Not To Sue shall not apply to any other patents issued as of the effective date of this Agreement or to be issued in the future.
>
> *    *    *
>
> 8. TCI, TII and GRAVELLE, for themselves and their respective predecessors, successors, heirs and assigns, fully and forever release, discharge and dismiss all claims, demands, actions, causes of action, liens and rights, in law or in equity (known, unknown, contingent, accrued,

inchoate or otherwise), existing as of June 26, 2001, that they have against MARK IV, and its officers, directors, employees, representatives and attorneys of MARK IV, but excluding any claims for breach of this Agreement. No express or implied license or future release whatsoever is granted to MARK IV or to any third party by this Release.

Several years later, ETC, a firm engaged in consulting and systems integration related to toll-collection systems, won a bid with the Illinois State Toll Highway Authority (ISTHA) to install and test a new open-road tolling system. As part of the contract, ETC agreed to set up and test toll-collection systems purchased by the ISTHA from Mark IV.

TransCore sued ETC for infringement of three patents that had previously been in suit against Mark IV (U.S. Patent Nos. 5,805,082; 5,289,183; and 5,406,275 (the '082, '183, and '275 patents)) as well as U.S. Patent No. 6,653,946 (the '946 patent), a related patent that was pending before the Patent and Trademark Office but had not yet issued at the time of the TransCore–Mark IV settlement. During a hearing, the district court questioned the legal impact of the TransCore–Mark IV settlement agreement on the TransCore–ETC lawsuit and ordered the parties to brief the issue. ETC responded by filing a motion for summary judgment with the district court, asserting that its activities were permitted by the TransCore–Mark IV settlement agreement under the related doctrines of patent exhaustion, implied license and legal estoppel.

On May 22, 2008, the district court granted ETC's motion, dismissed TransCore's claims with prejudice and directed the entry of final judgment. TransCore timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). We

review a district court's grant of summary judgment without deference, reapplying the same standard as the district court.  Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1121 (Fed. Cir. 2003).  "In deciding whether summary judgment was appropriate, we view the evidence in a light most favorable to the party opposing the motion with doubts resolved in favor of the opponent . . . ."  Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 149 F.3d 1309, 1315 (Fed. Cir. 1998).

## I.

The district court found that Mark IV's sales of the toll collection systems installed by ETC were authorized by the TransCore–Mark IV settlement agreement, such that TransCore's patent rights were exhausted as to those systems.  We agree.[1]

## A.

Recently, in Quanta Computer, Inc. v. LG Electronics, Inc., 128 S. Ct. 2109 (2008), the Supreme Court reiterated unequivocally that "[t]he longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item," id. at 2115, and that "[e]xhaustion is triggered only by a sale authorized by the patent holder," id. at 2121.  The question for this court is whether an unconditional covenant not to sue authorizes sales by the covenantee for purposes of patent exhaustion.  We hold that it does.

TransCore asserts that sales under a covenant not to sue are not "authorized," relying heavily on Jacobs v. Nintendo of America, Inc., 370 F.3d 1097 (Fed. Cir. 2004).  In Jacobs, a panel of this court addressed the respective roles of a license term and a

---

[1]   Because we agree with the district court that TransCore's claims are barred by the doctrine of patent exhaustion, we need not address the district court's decision on the related doctrine of implied license by no non-infringing use.

covenant not to sue in a settlement agreement. Explicitly considering downstream customer liability, the panel explained:

> If all that [the patent holder] intended to do through the settlement agreement was to free [the infringing manufacturer] of its liability for infringement, paragraph 5 of the agreement (the covenant not to sue) would have been fully sufficient to serve that purpose. Paragraph 3 [the license provision], however, goes much further by granting [the infringing manufacturer] an affirmative right to engage in the manufacture and sale of accelerometers to be used in tilt-sensitive control boxes. That grant comes without restriction of any kind.

Id. at 1101. The court in Jacobs was differentiating between settlement terms for the express purpose of determining the contracting parties' intent in the context of an implied license analysis. As the Supreme Court explained in Quanta, however, the parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis. See Quanta, 128 S. Ct. at 2122 ("But the question whether third parties received implied licenses is irrelevant because [the downstream customer] asserts its right to practice the patents based not on implied license but on exhaustion. And exhaustion turns only on [licensee's] own license to sell products practicing the [licensor's] Patents."). The analysis in Jacobs, therefore, does not apply here.

Rather, our analysis begins with the premise that one cannot convey what one does not own. This principle is particularly important in patent licensing, as the grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude. See 35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States . . . ."); see also Leatherman Tool Group Inc. v. Cooper Indus., Inc., 131 F.3d 1011, 1015 (Fed. Cir. 1997) ("In fact, the federal patent

laws do not create any affirmative right to make, use, or sell anything. . . . [T]he Supreme Court made clear that the patent laws provide a limited right to exclude others from making, using, or selling a claimed invention for a limited period of time, but afford no affirmative right to make, use, and sell a patented invention." (citing <u>Bloomer v. McQuewan</u>, 55 U.S. (14 How.) 539, 548 (1852) ("The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."))).  It follows, therefore, that a patentee, by license or otherwise, cannot convey an affirmative right to practice a patented invention by way of making, using, selling, etc.; the patentee can only convey a freedom from suit.

For this reason, the Supreme Court in <u>De Forest Radio Telephone & Telegraph Co. v. United States</u>, reiterated:  "As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee."  273 U.S. 236, 242 (1927) (treating a covenant not to enjoin infringing acts as a license).  To like effect, this court and its predecessors have on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue:

> As a threshold matter, a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee.  Even if couched in terms of "[l]icensee is given the right to make, use, or sell X," the agreement cannot convey that absolute right because not even the patentee of X is given that right.  His right is merely one to exclude others from making, using or selling X.  Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents.  In any event, patent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.

<u>Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft</u>, 829 F.2d 1075, 1081 (Fed. Cir. 1987) (citations

omitted); see also U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1189 (Fed. Cir. 2005) ("A nonexclusive patent license is simply a promise not to sue for infringement."); Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir. 2004) ("This license is, in essence, a licensor's covenant not to sue the licensee."); Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1346 (Fed. Cir. 2001) ("This court has stated that 'licenses are considered as nothing more than a promise by the licensor not to sue the licensee.'" (quoting Jim Arnold Corp. v. Hydrotech Sys., Inc., 109 F.3d 1567, 1577 (Fed. Cir. 1997))); Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1345 (Fed. Cir. 2001) (defining "a nonexclusive license or 'bare' license" as "a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities"); Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1031 (Fed. Cir. 1995) ("A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right."); W. Elec. Co. v. Pacent Reproducer Corp., 42 F.2d 116, 118 (2d Cir. 1930) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly."). The real question, then, is not whether an agreement is framed in terms of a "covenant not to sue" or a "license." That difference is only one of form, not substance—both are properly viewed as "authorizations." Rather, the pertinent question here is not whether but what the TransCore–Mark IV settlement agreement

authorizes. More specifically, does the TransCore–Mark IV settlement agreement authorize <u>sales</u>? We conclude that it does.

The language of the TransCore–Mark IV settlement agreement is unambiguous: "[TransCore] agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement . . . ." This term, without apparent restriction or limitation, thus authorizes all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing. TransCore did not, as it could have, limit this authorization to, for example, "making" or "using." And indeed, at oral argument, TransCore conceded that the TransCore–Mark IV settlement agreement does not include a restriction on sales. <u>See</u> Audio Recording of Oral Arg. at 40:54–42:25, <u>TransCore, LP v. Elec. Transaction Consultants Corp.</u>, No. 2008-1430 (Fed. Cir. Feb. 5, 2009), <u>available at</u> http://oralarguments.cafc.uscourts.gov/mp3/2008-1430.mp3; <u>cf.</u> <u>Quanta</u>, 128 S. Ct. at 2121 (applying patent exhaustion where "[n]othing in the License Agreement restricts [licensee's] right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts. It broadly permits Intel to 'make, use, [or] sell' products free of [licensor's] patent claims." (internal quotation marks omitted)). As a result, the district court correctly found that Mark IV's sales to ISTHA were authorized and that TransCore's patent rights are exhausted. The inclusion of the language "No express or implied license or future release whatsoever is granted to MARK IV or to any third party by this Release" refers only to the effect of the Release provision and thus does not require a different result.

B.

As a subordinate issue to the proper interpretation of the covenant not to sue, TransCore argues that the district court abused its discretion by excluding parol evidence of TransCore's and Mark IV's intent at the time they entered into the settlement agreement. We disagree.

Evidentiary rulings, which are procedural in nature, are reviewed by this court according to the law of the regional circuit. See Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1363 (Fed. Cir. 2004). Applying Fifth Circuit law, "unless the trial court has abused its discretion and a substantial right of the defendant has been affected, we will not reverse on the basis of [an] evidentiary ruling in question." United States v. Saldana, 427 F.3d 298, 306 (5th Cir. 2005).

The district court's decision to exclude TransCore's parol evidence has not affected any substantial right of TransCore. On this point Quanta is clear. The only issue relevant to patent exhaustion is whether Mark IV's sales were authorized, not whether TransCore and Mark IV intended, expressly or impliedly, for the covenant to extend to Mark IV's customers. See Quanta, 128 S. Ct. at 2122. TransCore's proffered evidence of the parties' intent not to provide downstream rights to Mark IV's customers is, therefore, irrelevant and could not impact the outcome reached by the district court and affirmed here.

Moreover, California law, which governs the TransCore–Mark IV settlement agreement, prohibits the admission of parol evidence: (i) to insert an additional term into a written contract, if the contract is a complete and exclusive statement of the terms of the agreement, Cal. Civ. Proc. Code § 1856(b), (d); and/or (ii) to influence the meaning

of contract terms where no ambiguity exists, id. § 1856(g); see also Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442 P.2d 641, 644–45 (Cal. 1968).[2]  The district court correctly concluded that the settlement agreement is a final, complete and exclusive agreement, and that the settlement agreement is unambiguous.  We, therefore, find no error in the district court's decision not to admit TransCore's parol evidence.

## C.

TransCore further argues that several material facts remain in dispute: (1) which Mark IV entity actually sold the products to ISTHA for installation by ETC; (2) whether the sale from Mark IV to ISTHA occurred within the United States; and (3) assuming Mark IV US (referred to by the parties, at times, as "IVHS") is found to have actually sold the products to ISTHA, whether Mark IV US was included within the terms of the TransCore–Mark IV settlement agreement, which extended coverage to "sister" companies of Mark IV Canada.  Based on the record before the district court, as viewed in the light most favorable to TransCore (the non-movant), we disagree.

Although the parties do not agree about which Mark IV entity actually sold the toll collection products—the irrevocable offer was made by Mark IV US, but the purchase order was placed with (and the order was ultimately filled by) Mark IV Canada—there is no dispute that a Mark IV entity was responsible for the sale.

---

[2]    We note that, under California law, the district court may receive and consider extrinsic evidence to determine whether one or more terms of a contract is reasonably susceptible to multiple meanings, see Dore v. Arnold Worldwide, Inc., 139 P.3d 56, 60 (Cal. 2006), but once the district court determines that no ambiguity exists, as it did here, extrinsic evidence is properly not admitted, see Pac. Gas, 442 P.2d at 644–45.

Moreover, there is no dispute that the toll collection products were sold and shipped to ISTHA. Even if we accept TransCore's assertions that the products were shipped from Canada, this does not alter the essential fact that the transaction as a whole ultimately occurred "to" the United States. See Lightcubes, LLC v. N. Light Prods., Inc., 523 F.3d 1353, 1369–71 (Fed. Cir. 2008) (finding that a sale "to" the United States is sufficient to support infringement liability).

Finally, as to the third "disputed" fact—whether Mark IV US is covered by the terms of the TransCore–Mark IV settlement agreement—the parties do not dispute that both Mark IV US and Mark IV Canada are wholly-owned subsidiaries of Mark IV Industries. Because the term "sister company" is commonly used and generally understood to refer to a subsidiary company that shares common ownership (i.e., a common "parent") with another subsidiary company, see generally, e.g., Poly-America, L.P. v. GSE Lining Tech., Inc., 383 F.3d 1303 (Fed. Cir. 2004) (referring to two corporations that share a common parent as "sister corporations"); Humana Inc. v. Comm'r, 881 F.2d 247 (6th Cir. 1989) (referring to all subsidiaries of Humana, Inc. as "brother-sister" corporations), we find it to be beyond dispute that Mark IV US is a "sister" company of Mark IV Canada and thus has the same express authority under the TransCore–Mark IV settlement agreement as any other "sister" company.

II.

The district court further found that TransCore's rights to the '946 patent—which had not yet issued and was thus not identified in the TransCore–Mark IV settlement agreement—were exhausted by Mark IV's authorized sales under an implied license to practice that patent by virtue of legal estoppel. Again, we agree with the district court.

As explained by our predecessor court in <u>AMP Inc. v. United States</u>, 389 F.2d 448 (Ct. Cl. 1968):

> [W]hen a person sells a patent which employs an invention which infringes a prior patent, the person selling is estopped from bringing an action against his grantee for that infringement, even though the earlier patent is acquired after the sale of the later patent. The same principle applies to the grant of a patent right by license as well as assignment.

<u>Id.</u> at 451 (citation omitted). Although TransCore argues that this form of legal estoppel only applies to "prior" or "earlier" patents, we see no reason for so fine a distinction—the timing of patent issuance is no more relevant to this inquiry than the timing of acquisition. Indeed, the court in <u>AMP</u> explained the policy rationale underlying the legal estoppel doctrine in the following manner:

> The essence of legal estoppel that can be found in the estoppel of the implied license doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right. The grantor is estopped from taking back in any extent that for which he has already received consideration.

<u>Id.</u> at 452. The basic principle is, therefore, quite simple: "Legal estoppel refers to a narrow[] category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted." <u>Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.</u>, 103 F.3d 1571, 1581 (Fed. Cir. 1997).

On summary judgment, ETC asserted, and TransCore did not dispute,[3] that TransCore's later-issued '946 patent was broader than, and necessary to practice, at

---

[3] On appeal, TransCore claims that it is possible to practice the '183, '275 and '082 patents without infringing the '946 patent. TransCore did not, however, raise this argument to the district court. We, therefore, deem it waived. <u>See</u> <u>Sage Prods., Inc. v. Devon Indus., Inc.</u>, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument

least the '082 patent that was included in the TransCore–Mark IV settlement agreement. Indeed, during discovery TransCore adopted its '082 patent infringement contentions as its contentions related to the '946 patent.[4]  Absent argument to the contrary, the district court properly concluded that in order for Mark IV to obtain the benefit of its bargain with TransCore, it must be permitted to practice the '946 patent to the same extent it may practice the '183, '275 and '082 patents.  TransCore is, therefore, legally estopped from asserting the '946 patent against Mark IV in derogation of the authorizations granted to Mark IV under the '183, '275 and '082 patents.  And Mark IV is, in turn, an implied licensee of the '946 patent.  The language of the TransCore–Mark IV settlement agreement, which states that "[t]his Covenant Not To Sue shall not apply to any other patents . . . to be issued in the future," is not to the contrary.  This language may protect TransCore against broad claims that future patents generally are impliedly licensed, but it does not permit TransCore to derogate from the rights it has expressly granted and thus does not preclude a finding of estoppel.

Mark IV's rights under its implied license to the '946 patent are necessarily coextensive with the rights it received in the TransCore–Mark IV license agreement. Mark IV's sales to ISTHA were thus authorized and, accordingly, exhausted TransCore's patent rights in the products sold.

CONCLUSION

---

to the trial court.  In short, this court does not 'review' that which was not presented to the district court.").

[4]  At oral argument, TransCore argued that "a contention of infringement . . . is not enough for an implied license."  Oral Arg. at 39:31–39:35.  This argument misses the mark.  TransCore's contentions did not create the implied license; they merely serve as evidence that TransCore sought to enforce the '946 patent in derogation of the rights it granted under the TransCore–Mark IV settlement agreement.  That attempted derogation is prevented by legal estoppel, which gives rise to the implied license.

The district court's decision, granting summary judgment and thus dismissing TransCore's claims, is affirmed.

<u>AFFIRMED</u>

COSTS

No costs.