MOORE, Circuit Judge.
Endo Pharmaceuticals, Inc. (Endo) appeals from the district court’s order denying its motions for a preliminary injunction to prevent Roxane Laboratories, Inc. (Roxane), Actavis Inc., and Actavis South Atlantic LLC (Actavis) from marketing and selling their respective generic drug products during the pendency of this litigation. Because the district court erred in concluding that Roxane and Actavis (Ap-pellees) had an implied license to practice the asserted patents, and because Appel-lees do not have an express license, we vacate and remand.
Background
Endo sells Opana® ER, which are branded extended-release tablets containing a painkiller called oxymorphone. The asserted patents are listed in the Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book) entry for Opana® ER. Two of the asserted patents, U.S. Patent Nos. 8,309,122 (the '122 patent) and 8,329,216 (the '216 patent), are each continuations of the same parent application and are directed to extended-release oxymorphone compositions and methods of treating pain using those compositions. The third patent-in-suit, U.S. Patent No. 7,851,482 (the '482 patent), is not related to the other two patents. It recites purified oxymorphone compositions and methods of making those compositions. The '122 and '216 patents are at issue in both appeals, and the '482 patent is at issue only in the Actavis appeal.
Prior to this litigation, Endo sued Appel-lees for patent infringement under 35 U.S.C. § 271(e)(2)(A) based on their Abbreviated New Drug Applications (AN-DAs) to market generic versions of Opa-na® ER-the same products as those at issue in these appeals. The first set of *1373 lawsuits settled after Endo granted to Ap-pellees a license and a covenant not to sue. The settlement and license agreement between Endo and Roxane (Roxane Agreement) defines “Licensed Patents” as follows:
(a) any [U.S.] patents that are both (i) now owned by Endo ... and (ii) issued as of the Effective Date of this Agreement, including the Opana® ER Patents,
(b) any [U.S.] patent applications that claim priority to the Opana® ER Patents, including any continuation, continuation-in-part and divisional patent applications that claim priority to Opa-na® ER Patents, and
(c) any patents resulting from the reissue or reexamination of patents or patent application of patents or patent applications comprised within clauses (a) and (b) ...
J.A. in appeal no. 2013-1662 (Roxane J.A.), at 4973 § 1.16 (emphases added). The Roxane Agreement defines “Opana® ER Patents” as U.S. Patent Nos. 5,662,-933, 5,958,456, and 7,276,250. Id. § 1.20.
Pursuant to the agreement, Endo granted Roxane a covenant that it would not assert that Roxane’s generic versions of Opana® ER “infringe[ ] the Licensed Patents” and a license “under the Licensed Patents ... to make, use, have made, sell, offer to sell, import and use” those generic products. Roxane J.A. 4978 §§ 4.1(a),(b) (emphases added); see also Roxane J.A. 4974 §§ 1.28, 1.29. Finally, the Roxane Agreement includes a “No Implied Rights” provision stating that Endo does not grant to Roxane any license or right “whether by implication, estoppel or otherwise, other than as expressly granted herein.” Rox-ane J.A. 4949 § 4.4. The settlement and license agreement between Endo and Ac-tavis (Actavis Agreement) is similar. The Actavis Agreement includes a grant of a license, a covenant not to sue, and a “No Implied Rights” provision, but covers one additional patent not included in the Rox-ane Agreement and not relevant to this appeal. J.A. in appeal no. 2013-1658 (Ac-tavis J.A.), at 4893-908.
The patents that are the subject of this litigation issued after Endo’s agreements with Appellees. The '122 and '216 patents issued to Endo and the '482 patent was acquired by Endo. Endo again sued Appel-lees for patent infringement under 35 U.S.C. § 271(e)(2)(A) and moved for a preliminary injunction to prevent the marketing and sales of their generic oxymorphone formulations. Appellees opposed on the theories of express license and implied license by reason of legal estoppel. With regard to the latter, Appellees argued that Endo attempted to deprive them “of the benefit of [the] earlier bargain.” Roxane J.A. 4823; see also Actavis J.A. 2717.
At a joint hearing, the district court commented that “this is a highly unfair and unjust situation if ... infringement of the new patents would stop the marketing and permitting process that was going on by Actavis and Roxane.” Actavis J.A. 6411. The court held that “as a matter of law ... Endo is estopped from claiming that the activity of Actavis and Roxane, which has gone on for a substantial period of time, is now suddenly barred because of these new patents.” Id. The court therefore denied Endo’s motions. Endo Pharm., Inc. v. Actavis Inc., C.A. No. 12-cv-8985-TPG (S.D.N.Y. Sept. 18, 2013), ECF No. 35.
Endo appeals. We have jurisdiction under 28 U.S.C. § 1292(a)(1).
Discussion
We review decisions to grant or deny a preliminary injunction for an abuse of discretion, which may be established *1374 when a district court based its decision on an error of law. Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1374 (Fed.Cir. 2006). “To the extent the court’s decision is based upon an issue of law, we review that issue de novo.” Id. Whether legal estoppel has been created and whether an implied license exists are questions of law. Wang Labs., Inc. v. Mitsubishi Elees. Am., Inc., 103 F.3d 1571, 1578, 1580 (Fed.Cir. 1997). “The interpretation of a Settlement Agreement, i.e., a contract, is a question of law that we [also] review de novo.” Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367, 1370 (Fed.Cir. 1999). “The burden of proving that an implied license exists is on the party asserting an implied license as a defense to infringement.” Id.
I. Express License
Endo argues that the district court abused its discretion in denying Endo’s motions for a preliminary injunction. Endo contends that the plain language of the agreements, which limit “Licensed Patents” to several enumerated patents and applications claiming priority to them, does not grant Appellees an express license to practice the asserted patents. It argues that the “No Implied Rights” provision further makes clear that the agreements do not cover the asserted patents. In the district court, both Actavis and Roxane argued that they have an express license to practice these newly issued patents. In this appeal, Actavis no longer presents this argument, although Roxane continues to do so. The district court did not decide the question of express license, stating that “I do not feel, for the purposes of a preliminary injunction motion, that I am able to make any findings on the issues that I have just described.” Actavis J.A. 6438.
Roxane responds that the express terms of the settlement and license agreement grant it a license to practice the asserted patents because the previously licensed U.S. Patent No. 7,276,250 ('250 patent) claims priority to U.S. Provisional Application No. 60/303,357 ('357 application), and the '122 and '216 patents also claim priority to that provisional application. It contends that the word “including” in § 1.16(b) of the Roxane Agreement shows that the agreement covers more than just continuation, continuation-in-part, and divisional applications that claim priority to the Opana® ER Patents. Roxane argues that this section “necessarily embraces any patent applications that claim priority to any applications and provisional applications” to which the licensed patents likewise claim priority. Roxane Br. 29. It contends that Endo’s interpretation reads out the word “including” and other license terms, and argues that the common provisional application teaches subject matter that “binds” the '250 patent to the asserted '122 and '216 patents.
Roxane’s express license arguments are meritless. Section 1.16(b) of the Roxane Agreement covers U.S. patent applications that “claim priority to the Opana® ER Patents [e.g., any of the licensed patents], including any continuation, continuation-in-part and divisional patent applications that claim priority to Opana® ER Patents.” Roxane J.A. 4973 § 1.16(b). There can be no dispute that the '122 and '216 patents are not continuations of any of the licensed patents.[1] Likewise, there is no reasonable *1375 argument that the '122 and '216 patents claim priority to any of the licensed patents. An application that claims priority to another patent must contain an express cross-reference to “a prior-filed nonprovisional application from which the patent issued.” 37 C.F.R. § 1.78(d)(2) (2018); see 35 U.S.C. § 120 (2012); Encyclopaedia Britannica, Inc. v. Alpine Elees, of Am., Inc., 609 F.3d 1345, 1351 (Fed.Cir.2010). The '216 and '122 patents, however, do not cross-reference the applications that issued as any of the licensed patents. See '122 patent col. 111. 6-7; '216 patent col. 111. 6-7. Therefore, it is quite clear that the '122 and '216 patents do not “claim priority to” any of the licensed patents.
Roxane’s argument that the word “including” somehow broadens what it means “to claim priority to’-’ another patent is unpersuasive. The Roxane Agreement covers “any applications that claim priority to the ['250 patent], including any continuation, continuation-in-part and divisional” patent applications. Roxane J.A. 4973. Claiming priority to a licensed patent is a prerequisite for the license, and “including” by no means eviscerates that requirement. There is no reading of this language that extends coverage to patents that merely have a provisional application in common with the licensed patents. The figure reproduced below, which is part of the record, shows this clearly. See Roxane J.A. 5232. The '122 and '216 patents claim priority to the '357 provisional application, and the '250 patent claims priority to the '357 application as well. The '122 and '216 patents do not claim priority to the '250 patent. Although the language is clear on its face, the fact that Endo and Roxane considered including in their agreement a grant of a license to “any application claiming a common priority date as the licensed patents” reinforces this conclusion. Roxane J.A. 4864-65 (emphasis added). Because the '122 and '216 patents have a provisional application in common with the '250 patent, the “common priority date” language would have expressly covered the '122 and '216 patents. See 35 U.S.C. § 119(e)(1) (2012). But that language does not appear in the final version of the Roxane Agreement.
*1376 [[Image here]]
The Aetavis Agreement likewise does not cover the '122, '216, and '482 patents at issue in the Aetavis appeal. It contains the same “continuations, continuations-in-part or divisionals” language as the Rox-ane Agreement. See Aetavis J.A. 4893, 4895, 4898. For the reasons discussed above, the asserted patents are not continuations, continuations-in-part, or division-als of the licensed patents. See MPEP §§ 201.06-.08. Finally, the '482 patent is completely unrelated to any of the previously licensed patents, and is likewise not covered by the agreement. We hold that Appellees do not have an express license to practice any of the patents asserted in this litigation.
II. Implied License
Endo argues that the district court legally erred in concluding that Appellees are impliedly licensed to practice the asserted patents due to legal estoppel. It contends that the court’s recognition of an implied license defense is incorrect. It argues that the specifications of the asserted patents are different from those of the previously licensed patents, and that the claims cover different subject matter. Endo points out that the previously licensed patent (the '250 patent) that claims priority to the same provisional application as the '122 and '216 patents was not even asserted in the previous litigation, and only added to the final settlement and license agreements because Endo realized that Appellees did not infringe it. Endo argues that, in contrast, the '122 and '216 patents — and the unrelated '482 patent— cover the accused generic tablets. Endo argues that the cases relied upon by Ap-pellees regarding estoppel are distinguishable because they involved continuations and because the licenses in those cases included products as well as patents. Endo argues that, by ignoring the language of the agreements and the parties’ intent, the district court’s approach violates the sanctity of contract and thus implicates serious public policy concerns.
Appellees respond that they have an implied license to practice the asserted patents based on the principle that equity does not permit the licensor to detract from its grant of a property right. Appel-lees contend that Endo granted them a license to market their accused generic *1377 products for valuable consideration, that they relied on the license in going forward with the Food and Drug Administration approval of the ANDAs, and that Endo’s later-obtained patents “eviscerated” the benefit of the licenses. Appellees argue that the “No Implied Rights” language in the agreements is not dispositive because estoppel “must override any such provision.” Roxane Br. 22; see Actavis Br. 29-30.
Appellees contend that the facts here are analogous to those in TransCore, LP v. Electronic Transaction Consultants Corp., where we held that the patentee was legally estopped from bringing a second infringement action even though the earlier settlement agreement stated that it “shall not apply to any other patents.” 563 F.3d 1271, 1279 (Fed.Cir.2009). They argue that TransCore and related cases dictate that Endo cannot deprive Appellees of the benefit of the earlier bargain, and that nothing in the reasoning of TransCore limits its holding to continuations or even related applications. Appellees contend that the settlement and license agreements should be deemed as allowing them to make, use, and sell their generic tablets without threat of further lawsuits by Endo.
We hold that Appellees’ broad reading of TransCore is incorrect and agree with Endo that the district court erred as a matter of law in finding legal estoppel in favor of Actavis and Roxane. We begin with the well-established proposition, recognized in TransCore, that a patent license does not convey to the licensee “an absolute right” to make, use, or sell a product “because not even the patentee ... is given that right.” Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktienge-sellschaft, 829 F.2d 1075, 1081 (Fed.Cir. 1987) (quoted in TransCore, 563 F.3d at 1275-76). The patentee’s right “is merely one to exclude others from making, using or selling [the product covered by the licensed patent], 35 U.S.C. § 154” and “the patentee ... and his licensee, when making, using, or selling [the product], can be subject to suit under other patents” when practicing the patented invention. Id.
The doctrine of legal estoppel does not nullify these general principles. Instead, it “refers to a narrow category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted.” Trans-Core, 563 F.3d at 1279 (alteration omitted) (emphasis added). In TransCore, the pat-entee asserted a continuation patent that “was broader than, and necessary to practice” one of the patents included in a prior settlement agreement. Id. We observed that the fact that the patentee “adopted its [licensed] patent infringement contentions as its contentions related to the [asserted] patent,” id., provided undisputed evidence that the patentee “sought to enforce the [asserted] patent in derogation of the rights it granted” under the prior agreement, id. at 1279 n. 4. Even though the agreement stated that it “shall not apply to other patents ... to be issued in the future,” we concluded that the patentee was legally estopped from asserting a patent whose claim scope fully encompassed that of the claims of one of the licensed patents. Id. at 1279. We thus recognized that the asserted patent claims were broader than the licensed claims. To avoid a windfall to the licensee, we expressly limited the implied license to the scope of the licensed claims. Id. (“[T]o obtain the benefit of its bargain with [the licensor], [the licensee] must be permitted to practice the [asserted patent] to the same extent it may practice the [licensed patents].”); id. at 1279-80 (“[Licensee’s] rights under its implied license to the [asserted patent] are neces *1378 sarily coextensive with the rights it received in the ... license agreement.”).
Our subsequent cases confirm the limited scope of TransCore. In General Pro-techt Group, Inc. v. Levitón Manufacturing Co., Inc., we found an implied license where the asserted patents had “[t]he same inventive subject matter [as that] disclosed in the licensed patents” and “[t]he same products were accused.” 651 F.3d 1355, 1361 (Fed.Cir.2011). As in TransCore, the patents at issue in General Protecht were continuations of the licensed patents. See id. at 1360 (quoting TransCore, 563 F.3d at 1279-80). We observed that “the newly asserted continuations are based on the same disclosure as the previously licensed patents and that, by definition, the continuations can claim no new inventions not already supported in the earlier issued patents.” Id. at 1361. After explaining that TransCore “prohibits a patent licensor from derogating from rights granted under the license,” we held that “where ... continuations issue from parent patents that previously have been licensed as to certain products, it may be presumed that, absent a clear indication of mutual intent to the contrary, those products are impliedly licensed under the continuations as well.” Id. (emphasis added). In Intel Corp. v. Negotiated Data Solutions, Inc., we explained that TransCore and General Protecht “analyzed a licensee’s rights when the patent holder received a continuation patent ” and “recognized that allowing the patent holder to sue on subsequent patents, when those later patents contain the same inventive subject matter that was licensed, risks derogating rights for which the licensee paid consideration.” 703 F.3d 1360, 1366 (Fed. Cir.2012) (emphases added). Taken together, these cases stand for the rule that a license or a covenant not to sue enumerating specific patents may legally estop the patentee from asserting continuations of the licensed patents in the absence of mutual intent to the contrary. See Gen. Pro-techt, 651 F.3d at 1361; TransCore, 563 F.3d at 1279. We reject Appellees’ invitation to expand the implied license doctrine. You get what you bargain for. And we will not use the implied license doctrine to insert ourselves into that bargain and rewrite the contract.
Endo is not estopped from asserting the patents at issue in these appeals because none of the asserted patents is a continuation of any of the licensed patents. The only familial relationship between the asserted and licensed patents is that the '122 and '216 patents claim priority to the same provisional application as the '250 patent. That, however, does not make these patents continuations of the '250 patent. See MPEP § 201.07. The '482 patent is not related to any of the licensed patents. The lack of a continuation relationship between any of the asserted and licensed patents and explicit disclaimer of any other licenses not within the literal terms of the contract are dispositive.
Appellees rely heavily on the general rule that “[t]he grantor is estopped from taking back in any extent that for which he has already received consideration.” Actavis Br. 27 (quoting TransCore, 563 F.3d at 1279 (quoting AMP Inc. v. United States, 389 F.2d 448, 452 (Ct.C1.1968))); see also Roxane Br. 20-21. But this rule does not apply to the cases before us because, unlike accused infringers in TransCore and General Protecht, Appellees seek to capture via implied license subject matter in addition to that for which they bargained. AMP is not to the contrary because the agreement at issue in that case gave the Government the license “to practice, and cause to be practiced ... throughout the world, each Subject Invention” — rather than any specific patents. 389 F.2d at 450, 454 (emphasis added). AMP made clear *1379 that “[t]he facet of this licensing agreement which is of crucial importance ... is that it licenses the Government to use an idea and not just the Byrem Patent itself.” Id. at 454 (emphasis in original). By asserting a newly acquired patent covering the licensed invention, AMP derogated from its grant, and the Court of Claims concluded that AMP’s patent infringement suit was barred by legal estoppel “in order to protect the specific rights granted to the Government by contract.” Id. at 454.
Here, rather than grant a license to an “idea,” Endo has granted to Appellees a license and covenant not to sue limited to specific patents and patent applications. If Appellees wanted to market and sell their accused generic products free from any threat of being sued by Endo for patent infringement, they could have negotiated for the appropriate language in the settlement and license agreements. As we observed in Spindelfdbrik, “patent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.” 829 F.2d at 1081 (quoted in TransCore, 563 F.3d at 1276). Having agreed to licenses that do not cover the patents at issue in these appeals, Appellees will not now be heard to complain.
CONCLUSION
We have considered the parties’ remaining arguments and do not find them to be persuasive. We vacate the district court’s denials of a preliminary injunction in both cases and remand for further proceedings.
VACATED AND REMANDED
Opinion dissenting in part filed by Circuit Judge DYK.

. We note that counsel for Actavis repeatedly argued to the district court that the '122 and '216 patents are continuations of the '250 patent and are therefore expressly licensed. See, e.g., Actavis J.A. 2716 ("Endo's '122 patent and '216 patent are continuations of a patent called out by number as licensed in the 2009 settlement and license agreement.”). This is flatly wrong, and it is difficult to believe that this argument was made given what *1375 is required for an application to be a continuation. For example, to be called a "continuation” of a prior patent, a patent must make an express cross-reference to the nonprovisional application from which the prior patent issued. The continuation must also have the same disclosure as the prior patent. See Manual of Patent Examining Procedure (MPEP) § 201.07 (8th ed. Rev.9, Oct. 2012). The '122 and '216 patents do not have the same disclosure as the '250 patent, nor do they claim priority to the application that issued as the '250 patent. To be continuations of the '250 patent, the '122 and '216 patents would have to, on their face, expressly indicate that they are continuations of the application that issued as the '250 patent— unequivocally, they do not.