DYK, Circuit Judge,
dissenting in part.
I agree with the majority that Roxane did not have an express or implied license to practice the '122 and '216 patents. Roxane was aware of Endo’s applications for those patents at the time of the settlement with Endo, and the parties agreed not to include them in the settlement agreement. This, it seems to me, is inconsistent with an implied license. I also agree that Actavis does not have an implied license to the '482 patent, which Endo did not own at the time of the Acta-vis settlement agreement.
I part company with the majority on the question of whether Actavis has an implied license to the '122 and '216 patents. At the time of their settlement agreement, Endo owned those patent applications, which claimed priority to the same provisional application that provided priority to a patent covered by the settlement agreement (the '250 patent). During the settlement negotiations, Endo did not disclose the '122 and '216 patent applications, but rather licensed Actavis to produce the product at issue here. Furthermore, there are material differences between the Acta-vis and Roxane agreements and negotiations. Under these circumstances, I conclude that Actavis has an implied license to practice the '122 and '216 patents with respect to the product covered by the ANDA that was the subject of the settlement agreement. I respectfully dissent from the majority’s contrary conclusion.
I
Under the Hatch-Waxman Act, pharmaceutical manufacturers filing a New Drug Application (NDA) must list patents in the FDA’s Orange Book that “could reasonably be asserted” against a competing generic producer. 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53(c)(2)(ii). Endo filed an NDA for a pain relief medication called *1380 Opana® ER on June 22, 2006 (NDA No. 21-610). Endo listed four patents covering the NDA product — the '250, '933, '456, and '143 patents — in the Orange Book. The FDA approved Endo’s NDA.
On February 14, 2008, Actavis sent Endo notice that it had filed an Abbreviated.New Drug Application (ANDA) seeking FDA approval to market a generic version of Opana® ER, as did Roxane on December 21, 2009. After receiving these notices, Endo sued Actavis and Roxane (which had also filed a similar ANDA) in the United States District Court for the District of New Jersey, claiming that Aeta-vis and Roxane’s ANDA filings constituted an act of infringement. See 35 U.S.C. § 271(e)(2)(A). Endo asserted only the '456 patent in the complaint.
Before the litigation could proceed to trial, Endo entered into separate settlement and license agreements with Actavis in 2009 and Roxane in 2011, permitting these companies to sell generic versions of Opana® ER pursuant to their ANDA filings. Sections 4.1(a) and (b) of Actavis’s agreement with Endo granted Actavis a license to produce and sell generic versions of Opana® ER under the '456 patent and specified that “Endo ... covenant[s] not to sue [ie., licenses] Actavis ... for infringement of ... the Opana® ER Patents [ie., the '250, '933, and '143 patents] based on the manufacture, use, import, sale or offer for sale of any Opana® ER Generic Products .... ” Actavis J.A. 3305. The Actavis agreement defined “Opana® ER Generic Product” as “any product that is ... sold under the Actavis ANDA.” Actavis J.A. 3302. Sections 4.1(a) and (b) of Roxane’s settlement agreement with Endo were similar.[1] Both agreements also contained clauses stating: “Endo ... do[es] not grant to Actavis [or Roxane] ... any license, right or immunity, whether by implication, estoppel or otherwise, other than as expressly granted herein.” Actavis J.A. 3306; Roxane J.A. 4569. However, as I later discuss, Roxane’s negotiation history and resulting agreement differed significantly in other respects from that of Acta-vis.
The FDA approved both Actavis’s and Roxane’s ANDAs, and those companies have been selling generic versions of Opa-na® ER under their ANDAs since 2011.
At the time of the settlement agreements, Endo had pending patent applications for the '122 and '216 patents. This was disclosed to Roxane but not to Actavis. After Actavis and Roxane began to sell their generic versions of Opana® ER pursuant to their settlement agreements, the PTO issued the '122 and '216 patents to Endo in November and December 2012, respectively. These patents cover Opa-na® ER’s active ingredient as well as its slow release method. See U.S. Patent No. 8,309,122; U.S. Patent No. 8,329,216. Endo has now listed these new patents in the Orange Book as related to Opana® ER. The '122 and '216 patents claim priority to the same 2001 provisional application that gave priority to the '250 patent licensed under the settlement agreements.
In this case, Endo has sought to enjoin Actavis and Roxane’s production of Opa-na® ER generic products on the ground that such sales infringe the '122 and '216 patents. Thus, the question is whether, as the district court held, these companies have implied licenses to produce the disputed products under their settlement agreements with Endo.
II
In my view, the majority’s holding that Actavis has no right to an implied license *1381 is inconsistent with our prior decisions in TransCore, LP v. Electronic Transaction Consultants Corp., 563 F.3d 1271 (Fed.Cir. 2009) and General Protecht Group, Inc. v. Leviton Manufacturing Co., Inc., 651 F.3d 1355 (Fed.Cir.2011). The majority reads these cases as standing for the proposition “that a license or a covenant not to sue enumerating specific patents may legally estop the patentee from asserting continuations of the licensed patents in the absence of mutual intent to the contrary.” Majority Op. at 1378. I think there is no meaningful distinction between the provisional patent relationship at issue in this appeal and the continuation patent relationships at issue in our earlier decisions.
The logic driving TransCore and General Protecht is rooted in a decision of our predecessor court, AMP Inc. v. United States, 389 F.2d 448 (Ct.Cl.1968). Our predecessor court’s decision in AMP recognized that a patentee may convey rights to future patents on that invention in licensing agreements even when the licensing agreement does not explicitly cover future patents on the same invention. Id. at 454-56. TransCore applied AMP’s holding to a situation similar to the present appeals. TransCore held that a paten-tee cannot license existing patents to another party for the production of a specific product and then assert a newly acquired patent against that party to prevent it from producing the same product. Trans-Core, 563 F.3d at 1278-79. As the majority accurately summarizes, the patentee in TransCore, after agreeing to license the product under existing patents, “asserted a continuation patent that “was ... necessary to practice’ one of the patents included in a prior settlement agreement.” Majority Op. at 1377 (quoting TransCore, 563 F.3d at 1279). Although the TransCore settlement agreement, similar to the settlement agreements at issue here, provided that “ ‘[t]his Covenant Not To Sue shall not apply to any other patents ... to be issued in the future,’ ” 563 F.3d at 1273, we held that “in order for [the licensee] to obtain the benefit of its bargain with TransCore, it must be permitted to practice the [new patent] to the same extent it may practice the [licensed] patents.” Id. at 1279. We further explained that “[t]his language may protect TransCore against broad claims that future patents generally are impliedly licensed, but it does not permit TransCore to derogate from the rights it has expressly granted and thus does not preclude a finding of estoppel.” Id. Thus, TransCore clarified that an explicit disclaimer of any other license not within the literal terms of the contract does not protect the patentee from an implied license when such a license is necessary to ensure the licensee obtains “the benefit of its bargain.” Id.
Similarly, in General Protecht, the pat-entee sued General Protecht for infringement of two patents, reached a license and settlement agreement with General Pro-techt allowing it to produce a defined product under the existing patents, and then, three years later, sued General Protecht again, alleging infringement of two new patents that issued after the settlement agreement. Gen. Protecht, 651 F.3d at 1357-58. The patentee argued that TransCore “d[id] not control” its appeal because TransCore “is limited to cases where the claims of the continuation are broader than and therefore necessary to practice the claims of the expressly licensed patents.” Id. at 1361. In response, this court reasoned that
[the patentee] cannot deny ... that the newly asserted continuations are based on the same disclosure as the previously licensed patents and that, by definition, the continuations can claim no new invention not already supported in the earlier issued patents. Moreover, the *1382 same products accused in the earlier suit are accused here. TransCore prohibits a patent licensor from derogating from rights granted under the license by taking back in any extent that for which it has already received consideration. In this case, [the patentee’s] actions have unquestionably derogated from [General Protecht]’s. rights under the Settlement Agreement. The same products were accused. The same inventive subject matter was disclosed in the licensed patents. If [the patentee] did not intend its license of these products to extend to claims presented in continuation patents, it had an obligation to make that clear.
Id. (emphasis added) (internal quotation marks and citation omitted) (alteration in original omitted).
Here too, if Endo succeeds on its infringement allegations, Aetavis will not be able to sell the very product for which it secured licenses in its settlement agreement. Although the '122 and '216 patents are not continuations of the licensed patents, as was the case in TransCore and General Protecht, the logic of those cases applies equally here. Under 35 U.S.C. § 119(e)(1), a patent that claims priority to a provisional application must “have the same effect, as to such invention [the provisional invention], as though filed on the date of the provisional application.” 35 U.S.C. § 119(e)(1). Thus, as we have explained in the past, “ ‘[w]hat is claimed by the patent application [claiming priority to a provisional application] must be the same as what is disclosed in the [provisional] specification.’ ” New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co., 298 F.3d 1290, 1296 (Fed.Cir.2002) (quoting Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002)) (citing Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1572 (Fed.Cir. 1997)); see also Ariad Pharms. Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1342 (Fed.Cir. 2010). That is to say, a patent claiming priority to a provisional application must cover the same inventive subject matter as the provisional application.
Since the '250 patent (covered by the license agreements) and the '122 and '216 patent applications (subsequently issued) claim priority to the same provisional application and, thus, must cover the same inventive subject matter, the agreements confer an implied license to the two new patents absent contrary evidence. In other words, under our decisions in Trans-Core and General Protecht, the settlement agreements here created a presumption that the '122 and '216 patents were impliedly licensed to Aetavis and Roxane, even though the only licenses explicitly mentioned in the settlement agreements were to the '250, '456, and '933 patents.
Ill
Nevertheless, I also think that the parties can agree to eliminate the presumption of implied licenses. Under our prior decisions, this cannot be accomplished simply by stating that the agreement does not extend to any patents beyond those listed in the agreement. TransCore and General Protecht rejected this very contention. See Gen. Protecht, 651 F.3d at 1362-63; TransCore, 563 F.3d at 1279. Here, as to Roxane there is more. In the course of its negotiations with Endo, Roxane became aware of the '122 and '216 patent applications, sought to have these pending patents included in the agreement, and ultimately failed to secure a license to them. That history, it seems to me, is sufficient to negate an implied license. But the Ac-tavis negotiations were different, having occurred two years before the Roxane agreement. The record contains no indication that the '122 and '216 patent appli *1383 cations were discussed during Actavis-Endo negotiations or that Actavis was even aware of Endo’s applications for the '122 and '216 patents.
While the majority states that the language of the Actavis and Roxane agreements is “similar,” Majority Op. at 1373, there are, in fact, important differences. Compare Actavis J.A. 3300, 3302, 3305 with Roxane J.A. 4563, 4568. While both agreements provide an explicit license to produce generic versions of Opana® ER covered by Actavis’s and Roxane’s ANDAs under the '250, '456, and '933 patents, clause (c) of the agreements is different. Clause (c) of the Actavis agreement reads:
(e) For avoidance of doubt, and notwithstanding anything to the contrary in this Agreement, the License and Covenant Not to Sue do not grant to Actavis any rights or immunities with respect to any products other than the Opana® ER Generic Products, including any combination products.
Actavis J.A. 3305 (emphasis added). Critically, the agreement defines “Opana® ER Generic Products” as “any product that is marketed and/or sold under the Actavis ANDA” Actavis J.A. 3302 (emphases added). Actavis sells the allegedly infringing product under the Actavis ANDA.
In contrast, clause (c) of the Roxane license agreement reads:
(c) ... the License and Covenant Not to Sue does not grant to Roxane any rights or immunities with respect to any products other than the Roxane Products or with respect to any patents other than the Licensed Patents.
Roxane J.A. 4568 (emphasis added). The agreement defines “Licensed Patents” as
(a) any United States patents that are both (i) now owned by Endo ... and (ii) issued as of the Effective Date of this Agreement, including the Opana® ER Patents, (b) any United States patent applications that claim priority to the Opana® ER Patents, including any continuation, continuation-in-part and divisional patent applications that claim priority to the Opana® ER Patents, and (c) any patents resulting from the reissue or reexamination of patents or parent applications comprised within clauses (a) and (b) above, in each case that Endo ... could assert would be infringing by the making, using, selling, offering to sell or importing of the Roxane Product.
Roxane J.A. 4563 (emphases added). Thus, while the Actavis license is only limited to “any product that is marketed and/or sold under the Actavis ANDA,” Actavis J.A. 3302 (emphasis added), the Roxane license specifies that it neither extends to any other “products” nor “to any patents other than the Licensed Patents,” Roxane J.A. 4568 (emphasis added), ie., the 250, '456, and '933 patents. Thus, in subsection (c), the Actavis agreement does not limit the license to specific patents as the Roxane agreement does. A comparison of the two license agreements and the different negotiation histories suggests that Actavis could reasonably conclude it had negotiated a right to sell all Opana® ER generic products despite the interim issuance of the '122 and '216 patents, not merely practice the patents expressly licensed.[2]
*1384 The majority concludes: “If Appellees wanted to market and sell their accused generic products free from any threat of being sued by Endo for patent infringement, they could have negotiated for the appropriate language in the settlement and license agreements.” Majority Op. at 1379. But under that theory, this court’s precedent in TransCore and General Pro-techt would have been wrongly decided. An implied license is not foreclosed simply because the parties could have negotiated for an express license. Here, as in General Protecht, Aetavis’s agreement allowed it to produce and sell a defined product, and we should imply licenses to the new patents because “the same products accused in the earlier suit are accused here,” Gen. Protecht, 651 F.3d at 1361, and the patents relate to the same inventive subject matter claimed in the provision application.
That the '122 and '216 patent applications were published at the time of the settlement negotiations should not affect this conclusion: in both General Protecht and TransCore, at least one of the new patents at issue was published as a pending application at the time of the settlement and licensing negotiations. See Gen. Protecht, 651 F.3d at 1357-58 (the paten-tee and General Protecht entered into a licensing agreement in 2007, and then the patentee sued General Protecht for infringement of two new patents — U.S. Patent Nos. 7,463,124 and 7,764,151 — in 2010); U.S. Patent No. 7,463,124 (first published on March 24, 2005, and issued on December 9, 2008); TransCore, 563 F.3d at 1273-74.
There is nothing unfair in granting an implied license in Actavis’s favor. Although Aetavis could have researched pending patent applications at the time of the settlement, placing the burden of disclosure on the party with greater access to information (here, Endo) increases the efficiency of the bargaining process. See generally Bruce L. Hay, Effort, Information, Settlement, Trial, 24 J. Legal Stud. 29, 31, 55-56, 62 (1995); Lucian Arye Bebchuk, Suing Solely To Extract a Settlement Offer, 17 J. Legal Stud. 437, 448 (1988); Lucian Arye Bebchuk, Litigation and Settlement Under Imperfect Information, 15 RAND J. Econ. 404, 414 (1984). Assigning this burden to the party with inferior access to information creates an incentive for the more knowledgeable party to hide information: the more informed party will not face repercussions for failing to disclose information, and, indeed, will benefit from such information asymmetries. See generally Bebchuk, Suing Solely, supra, at 448; Bebchuk, Litigation and Settlement, supra, at 414 (“[LJegal rules and institutions that magnify the extent to which an informational asymmetry is present might well increase the likelihood of litigation.”); Richard A. Posner, An Economic Approach to Legal Procedure and Judicial Administration, 2 J. Legal Stud. 339, 422-26 (1973). By creating incentives to hide and obscure important information in settlement negotiations, we undermine the purpose of the settlement process: the avoidance of further litigation.
I respectfully dissent.

. The Roxane agreement defined "Opana® ER Patents” as only the '250, '456, and '933 patents because the '143 patent expired in 2008.

. With respect to the '482 patent, that patent does not claim priority to the provisional application, and the negotiating history does not suggest that Actavis could reasonably conclude that it had negotiated a license to all future patents that might be acquired by Endo relating to Opana® ER. Because the '482 patent issued to another company, Johnson Matthey, in 2010, was acquired by Endo in 2012, and does not claim priority to the provisional application, Actavis should not be treated as having an implied license to the '482 patent. Neither Endo nor Actavis could have *1384 known that Endo might later acquire this patent.