FILED
United States Court of Appeals
Tenth Circuit

October 21, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

FUEL AUTOMATION STATION, LLC,

    Plaintiff - Appellee,

v.

ENERGERA INC.,

    Defendant - Appellant.

Nos. 23-1123 & 23-1358

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:20-CV-01492-STV)**

_____

Robert P. Greenspoon, Dunlap Bennett & Ludwig PLLC, Chicago, Illinois (Jonathan T. Suder and Jeffrey D. Parks, Friedman, Suder & Cooke, Fort Worth, Texas; and Brent E. Newton, Gaithersburg, Maryland, with him on the briefs), for Appellant.

Steven Susser (Alex Szypa with him on the briefs), Carlson, Gaskey & Olds, P.C., Birmingham, Michigan, for Appellee.

_____

Before **CARSON**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.

_____

**CARSON**, Circuit Judge.

_____

Defendant Energera, Inc. agreed not to sue Plaintiff Fuel Automation Station, LLC for infringement of certain patents.[1]  Defendant subsequently sued Plaintiff's affiliated entity and Plaintiff's subcontractor for patent infringement based on their use of Plaintiff's equipment.  The district court found that the covenant not to sue encompassed the relevant parties but was ambiguous as to whether it included the relevant patent.  Exercising jurisdiction under 28 U.S.C. § 1291, we hold the district court did not err in applying ordinary rules of contract construction and invoking the patent exhaustion doctrine to reach these legal conclusions.  We therefore affirm.

I.

Plaintiff and Defendant compete in the fuel industry.  Each party manufactures automated fuel delivery equipment and provides related services.  Defendant holds patents related to its fuel delivery equipment, including four at issue here: a Canadian patent, CA2,693,567 ("567 Patent"), and three subsequent United States patents—No. 9,346,662, No. 10,029,906, and a patent resulting from Application No. 15/997,340 (collectively, "U.S. Patents").

In 2016 and 2018, Defendant sued Plaintiff, alleging that Plaintiff's operations infringed on two of the U.S. Patents.  The parties resolved both lawsuits through a single settlement agreement executed July 13, 2019 ("Agreement").

The Agreement included several provisions relevant to this lawsuit.  First, the parties defined the scope of the patent rights at issue ("Patent Rights"):

---

[1] Defendant renamed itself from Frac Shack, Inc. to Energera, Inc. after the start of this litigation.

As used in this Settlement Agreement, [Defendant's] Patent Rights shall mean collectively, [the U.S. Patents]; any patent resulting from a continuation, continuation-in-part, or divisional related through priority claims to the [U.S. Patents]; and any foreign patent related through priority claims to the [U.S. Patents].

Next, the parties provided mutual covenants not to sue. Defendant promised Plaintiff as follows ("Covenant"):

[Defendant] covenants not to sue [Plaintiff], or otherwise engage [Plaintiff] in any domestic or foreign legal or administrative proceeding, for or based on infringement of the [Patent Rights]. This Covenant applies to [Plaintiff], its parent entities, predecessors, subsidiaries, affiliates, and their respective members, partners, shareholders, officers, directors, employees, successors, subsidiaries, affiliates, and assigns.

The parties also clarified the nature of their relationship ("License Disclaimer"):

Nothing herein shall be construed to place the Parties in a relationship of principal and agent, partners, joint venturers, or licensor and licensee, and no Party shall have the power to obligate or to bind any other Party in any manner whatsoever. This Settlement Agreement is not a license of any of [the Patent Rights] or of patents owned by [Plaintiff.]

The terms of the Agreement were confidential. But in an exhibit to the Agreement, the parties included language for a press release to announce the Agreement to the public ("Press Release"):

Atlas Oil Company and its affiliate [Plaintiff], together with [Defendant], announced that they have reached a complete settlement of the patent infringement lawsuits that were pending in the United States District Courts for the District of Colorado and the Southern District of Texas. Under the terms of the Settlement Agreement, neither Party conceded infringement or violation of any laws, and both Parties are expressly permitted to manufacture, use, sell, lease, and license their respective mobile automated fuel distribution units utilized in the fracking industry. The remaining terms of the Agreement are confidential.

In March 2020, Plaintiff contracted with a Canadian corporation—KVA Fuel Services Ltd. ("KVA")—for KVA to operate Plaintiff's fuel automation equipment in

3

Canada.  Within weeks, Defendant sued KVA, alleging its use of Plaintiff's equipment infringed on the 567 Patent ("KVA Lawsuit").  Plaintiff moved to intervene.

Plaintiff then separately sued Defendant, asserting three claims.  First, Plaintiff sought a declaration that the Covenant authorized Plaintiff to sell or lease its own equipment and therefore the patent exhaustion doctrine prohibited Defendant from suing customers, lessees, or users of Plaintiff's equipment.[2]  Plaintiff also brought two breach of contract claims, asserting that the Agreement authorized Plaintiff to sell its equipment and the patent exhaustion doctrine thus prohibited Defendant from suing KVA for downstream use, and that the KVA Lawsuit engaged Plaintiff in litigation in violation of the Covenant.

Around this time Plaintiff formed a Canadian corporation—FAS Canada—to operate Plaintiff's equipment in Canada.  Defendant sued FAS Canada, alleging that its operations infringed on Defendant's rights under the 567 Patent ("FAS Canada Lawsuit").  Plaintiff argued that the FAS Canada Lawsuit constituted a breach of the Agreement.  Defendant voluntarily dismissed the FAS Canada Lawsuit so the parties could instead resolve the related issues in this lawsuit.[3]

---

[2] In certain circumstances, the patent exhaustion doctrine prohibits a patentholder from suing a downstream user for patent infringement because the first authorized sale of the patented item exhausts the patentholder's right to control others' use of the item.  See Impression Prods., Inc. v. Lexmark Int'l, Inc., 581 U.S. 360, 370 (2017) (citing Bloomer v. McQuewan, 55 U.S. 539, 549 (1852)).

[3] Plaintiff did not amend its Complaint to specifically reference the FAS Canada Lawsuit.  But Plaintiff believed the Complaint language sufficiently

This lawsuit proceeded.  Plaintiff moved for summary judgment on its declaratory judgment count ("First MSJ").  Proceeding with consent jurisdiction, Magistrate Judge Scott T. Varholak analyzed extensively whether the Covenant included downstream users, and it granted the First MSJ in part ("First Order").  Later, both parties moved for further summary judgment on the issue of whether the Patent Rights covered the 567 Patent.  The district court denied both motions ("Second Order"), finding that an ambiguity in the Agreement created genuine issues of material fact.

After a trial on the merits, a jury found that the Patent Rights covered the 567 Patent and that Defendant had breached the Covenant.  The district court denied the parties' motions for judgment as a matter of law during trial and denied Defendant's post-trial renewed motion for judgment as a matter of law.  Defendant appeals the district court's pretrial rulings on questions of law and asks us to reverse the final judgment.

## II.

When a party appeals summary judgment rulings after a matter proceeds to trial, we may review the district court's legal rulings, but not its factual findings.  Dupree v. Younger, 598 U.S. 729, 735–36 (2023).  A district court's determination of whether a contract provision contains ambiguity is a legal ruling.  Sanpete Water

---

implicated the FAS Canada Lawsuit, and Plaintiff included legal fees from the FAS Canada Lawsuit in its damages calculation.  The inclusion of the FAS Canada Lawsuit is not before us on appeal.

5

Conservancy Dist. v. Carbon Water Conservancy Dist., 226 F.3d 1170, 1178 (10th Cir. 2000) (citing Bank of Okla. v. Muscogee (Creek) Nation, 972 F.2d 1166, 1171 (10th Cir. 1992)).  A district court's interpretation of an unambiguous contract provision is also a legal ruling.  Id. (citing Bank of Okla., 972 F.2d at 1171).  We review legal determinations de novo.  Id. (quoting Valley Improvement Ass'n v. United States Fid. & Guar. Corp., 129 F.3d 1108, 1115 (10th Cir. 1997)).

## III.

We first address Defendant's argument that the Covenant does not prohibit Defendant from suing Plaintiff's downstream users.  As a threshold matter, we must determine whether the district court provided an appealable legal ruling on this issue.

## A.

The parties dispute the scope of the district court's rulings on the downstream user issue.  In its First Order, the district court concluded: (1) the Covenant authorizes Plaintiff to engage in any act that would otherwise infringe on the Patent Rights, including by leasing and selling Plaintiff's own equipment; (2) the Covenant prohibits not only a direct lawsuit against parties enumerated in the Agreement, but also extends more broadly; (3) the words "otherwise engage" and the patent exhaustion doctrine inform the first two conclusions; and (4) the district court could not consider evidence outside of the Agreement's language because it did not find this provision susceptible to multiple reasonable interpretations.  The district court also agreed with the Federal Circuit's rule that when a patentholder authorizes an entity to sell or lease items and promises not to sue the entity for patent infringement,

6

the patentholder loses the right to sue the entity's customers. Yet in its conclusion, the district court declared only that the Covenant authorized Plaintiff to sell or lease its equipment, expressly refusing to declare whether the Covenant restricted suit against future third-party users and refusing to enjoin Defendant from suing Plaintiff's customers.

Defendant asserts the district court, in its First Order, erroneously applied the patent exhaustion doctrine and found, as a matter of law, that the Covenant extended to "downstream users"—entities or persons distinct from FAS who bought, leased, or otherwise obtained and used FAS's equipment. Plaintiff contends the district court's application of the patent exhaustion doctrine was not error. But Plaintiff points to the district court's conclusion and argues that the district court ultimately found genuine issues of material fact and sent the issue to the jury.

The district court's initial legal conclusions do not necessarily conflict with its final conclusion in the First Order. In the First MSJ, Plaintiff asked for summary judgment on its declaratory judgment count only—not its breach of contract counts. Plaintiff argued that Defendant would sue its prospective downstream users, but did not mention the KVA Lawsuit and did not request a declaration that the KVA Lawsuit breached the Covenant. In that context, the district court declined to provide relief that Plaintiff had requested as to *hypothetical* users—not because a genuine issue of fact existed, and not because the law did not support Plaintiff's request, but merely because the district court lacked authority to order for declaratory or equitable relief related to those hypothetical customers.

7

But—as the district court confirmed in its Second Order—the First Order's conclusions of law settled the issue of whether Defendant could breach the Covenant by suing KVA, a specific downstream user whom Defendant had already sued. The breach of contract claims, which proceeded to trial, both involved the KVA Lawsuit. At trial, both parties acknowledged—and the trial judge agreed—that because the district court previously ruled that the Covenant included downstream users, the jury needed only to determine whether the Covenant covered the 567 Patent. Indeed, the jury instructions and verdict form specified only one disputed provision: whether the Covenant covered the 567 Patent. The verdict form required the jury to decide whether Defendant breached the Covenant by bringing multiple lawsuits—without differentiating between the KVA Lawsuit (implicating downstream use) and the FAS Canada Lawsuit (not implicating downstream use). So, we agree with Plaintiff that the district court found as a matter of law in its First Order that the covenant protected KVA's downstream use.[4]

B.

Defendant argues that the Agreement unambiguously excludes downstream users from protection against patent infringement suits. More specifically, Defendant

---

[4] Plaintiff argues Defendant waived some or all of its arguments by failing to raise them in its post-trial renewed motion for judgment as a matter of law. But when a party appeals purely legal issues from a summary judgment order, the party need not raise the issue post-trial to preserve error. See Courage to Change Ranches Holding Co. v. El Paso Cnty., 73 F.4th 1175, 1190 (10th Cir. 2023) (quoting Dupree, 598 U.S. at 738) (citing Ruyle v. Cont'l Oil Co., 44 F.3d 837, 842 (10th Cir. 1994)). Defendant appeals only legal issues—not factual issues. Thus Defendant did not waive its arguments by failing to raise them again post-trial.

alleges the district court erred in applying the patent exhaustion doctrine, construing the Press Release and Covenant language to support protection for downstream users, and failing to interpret the License Disclaimer to prohibit protection for downstream users.  We disagree.

Colorado law requires courts to "determine and give effect to the intent of the parties" as "determined from the contract language itself."[5]  McAuliffe v. Vail Corp., 69 F.4th 1130, 1144 (10th Cir. 2023) (first quoting Ad Two, Inc. v. City of Denver ex rel. Manager of Aviation, 9 P.3d 373, 376 (Colo. 2000); and then quoting Union Rural Elec. Ass'n, Inc. v. Pub. Utilities Comm'n, 661 P.2d 247, 251 (Colo. 1983)).  Courts must read each provision in context with other provisions in an agreement and give effect to all provisions.  Union Rural, 661 P.2d at 252 (citing Oliner v. City of Englewood, 593 P.2d 977 (Colo. App. 1979); Kugel v. Young, 291 P.2d 695 (Colo. 1955)).  Under Colorado law, an agreement includes all of its attachments and exhibits.  Colo. Jury Instr., Civil 30:32 (Colo. Sup. Ct. Comm. on Civil Jury Instr. 2024) (instructing juries to consider attachments to an agreement); see also Kugel, 291 P.2d at 699 (interpreting an attachment as part of a contract).

A contractual provision is ambiguous when "it is fairly susceptible to more than one interpretation."  E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co., 109 P.3d 969, 974 (Colo. 2005) (quoting Dorman v. Petrol Aspen, Inc., 914 P.2d

---

[5] We apply Colorado law pursuant to the Agreement.  See McAuliffe v. Vail Corp., 69 F.4th 1130, 1143 (10th Cir. 2023) (citing Grynberg v. Total S.A., 538 F.3d 1336, 1346 (10th Cir. 2008)) (honoring parties' undisputed choice-of-law clause).

909, 912 (Colo. 1996)). To determine whether a contract provision is ambiguous, we construe it "in harmony with the plain, popular, and generally accepted meaning of the words employed and with reference to all provisions of the document." Wota v. Blue Cross & Blue Shield of Colo., 831 P.2d 1307, 1309 (Colo. 1992) (quoting Heller v. Fire Ins. Exch., 800 P.2d 1006, 1008 (Colo. 1990)).

We begin in this case by harmonizing the relevant Agreement provisions: the Covenant, the License Disclaimer, and the Press Release. In the Covenant, Defendant promised "not to sue [Plaintiff] or otherwise engage [Plaintiff] in any domestic or foreign legal or administrative proceeding" related to the Patent Rights. The Covenant expressly applies this protection to Plaintiff, its associated entities, and related individuals. The License Disclaimer states that this Agreement does not "place the Parties in a relationship of . . . licensor and licensee" and further asserts that the Agreement "is not a license" of either party's patents. In the Press Release, the parties agreed to announce that the Agreement "expressly permit[s]" each party to "manufacture, use, sell, lease, and license" its own equipment. The Agreement does not expressly include or disclaim third-party rights.

The district court determined the language "otherwise engage" reflected the parties' intent to expand the Covenant's application to protect downstream use. Defendant claims that the term "otherwise engage" in the Covenant plainly and ordinarily means "to enter or bring into conflict with," "to interlock or to cause to interlock," or "to become meshed or interlocked"—and that, based on these definitions, the KVA suit did not "engage" Plaintiff because Defendant never

10

required Plaintiff to join the suit.[6]  Thus, Defendant argues, the term "otherwise engage" does not provide protection against a downstream suit.

But dictionary definitions of "engage" are much broader than Defendant's narrow definition and include concepts such as "to involve"; "to entangle"; "to bring into conflict with the enemy"; and "to induce to participate."  Engage, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/engage_v (last visited July 23, 2024); Engage, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/engage (last visited July 23, 2024).  We conclude, therefore, that the district court properly interpreted the Covenant more broadly than Defendant's construction.  Indeed, Defendant must have known, to a high degree of certainty, that Plaintiff would be involved, entangled, brought into conflict, or induced to participate in a lawsuit Defendant brought against Plaintiffs' downstream users—such as the KVA Lawsuit.  So the language "otherwise engage" reasonably

---

[6] Defendant relies on a non-controlling, out-of-circuit district court case to support its limited definition of engage: Flexuspine, Inc. v. Globus Med., Inc., No. 6:15-CV-201-JRG-KNM, 2016 WL 3536709, at *9 (E.D. Tex. Apr. 8, 2016), report and recommendation adopted, No. 6:15-CV-201-JRG-KNM, 2016 WL 4161887 (E.D. Tex. Aug. 5, 2016).  This case is not persuasive.  Flexuspine dealt with the word "engage" in a completely different context (describing mechanical engagement), and did not make a holding on the issue. Instead, it merely noted that the parties agreed on the meanings of "engage."  Even if the case was somehow controlling or relevant, it would not help Defendant because the district court ultimately found that for the item to "engage" meant merely that contact was foreseeable, not that the item must have caused the contact or engagement to occur.

11

could show the parties' intent to prohibit Defendant from suing Plaintiff's downstream users.[7]

The Press Release also supports a broad interpretation. Because the parties attached the Press Release to the Agreement as Exhibit C, we must construe it as part of the Agreement. See Colo. Jury Instr., Civil 30:32 (Colo. Sup. Ct. Comm. on Civil Jury Instr. 2024). Fairly read, the Press Release assures current and prospective downstream users that Plaintiff had the authority to sell and lease equipment to downstream users. Indeed, it says explicitly that "both Parties are expressly permitted to manufacture, use, sell, lease, and license their respective mobile automated fuel distribution units utilized in the fracking industry." This construction shows that the parties contemplated downstream use of equipment that could implicate the Patent Rights.

Defendant argues that, despite the broad language of the Press Release and the Covenant, the License Disclaimer conclusively bars the Covenant from protecting third parties. Defendant points to general legal principles outside the patent context explaining that a license contains a promise transferable to others, while a covenant is a personal promise that protects only the grantee. See Keith Witek, 2 INTERNET

---

[7] Plaintiff does not argue as to how the term "otherwise engage" affects the meaning of the Covenant. But because an appellee carries no burden to make an argument or even file a response brief, we may reject Defendant's argument on this point and "affirm on any basis supported by the record." See Livingstone v. Livingstone, No. 22-1308, 2023 WL 8524922, at *5 n.7 (10th Cir. Dec. 8, 2023) (citing Fed. R. App. 31(c); Boulware v. Baldwin, 545 F. App'x 725, 731 (10th Cir. 2013); United States v. Olaveson, 656 F. App'x 434, 435 (10th Cir. 2016) (quoting Richison v. Ernest Grp. Inc., 634 F.3d 1123, 1130 (10th Cir. 2011)).

LAW AND PRACTICE § 23:5 (Thompson Reuters, Aug. 2023 update).  Defendant also

relies on case law interpreting a purported patent license as a mere covenant not to

sue, see Hilgraeve v. Symantec Corp., 265 F.3d 1336, 1346 (Fed. Cir. 2001 (quoting

Jim Arnod Corp. v. Hydrotech Sys., Inc., 109 F.3d 1567, 1577 (Fed. Cir. 1997)).

Thus, Defendant argues, because the Agreement doesn't create a license, it limits the

Covenant to a personal promise that protects only Plaintiff—not Plaintiff's

downstream users.

Defendant is correct that the Federal Circuit construes a purported patent

license as a covenant not to sue the purported "licensee" for patent infringement.[8]

See, e.g., TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271,

1275–76 (Fed. Cir. 2009) (quoting De Forest Radio Tel. & Tel. Co. v. United States,

273 U.S. 236, 242 (1927)) (construing an agreement that purports to be a patent

license as merely a covenant not to sue the purported "licensee" for patent

infringement).  This occurs because a patent does not grant the patentholder an

affirmative right to create the patented item; it only grants the right to exclude others

from creating that item.  TransCore, 563 F.3d at 1275 (citing 35 U.S.C. § 154(a)(1)).

A person cannot transfer an interest he does not possess, so a patentholder cannot, on

---

[8] The Federal Circuit generates much of our country's case law on patent-related doctrines because of its exclusive jurisdiction over many patent cases.  28 U.S.C. § 1295(a)(1),(4).  Colorado case law, on the other hand, does not discuss the patent exhaustion doctrine.  We thus believe that Colorado state courts would look to substantive decisions from the Federal Circuit for guidance on this issue.  The parties do not dispute this; indeed, both parties ask us to follow Federal Circuit decisions.

the basis of its patent, extend to others the affirmative right to create.  Id.  In contrast, a license is an affirmative grant of authority to commit an act that would otherwise be unlawful.  License, BLACK'S LAW DICTIONARY (11th ed. 2019).[9]

Based on these principles, we harmonize the License Disclaimer with the Covenant.  In the Covenant, Defendant lays aside its right to exclude: it promises not to exercise its right to take certain actions to prevent Plaintiff from infringing on the Patent Rights.[10]  But contrary to Defendant's argument, the License Disclaimer does not conflict with or limit the Covenant's promise.  Instead, the License Disclaimer merely acknowledges what is legally correct: that Defendant does not grant Plaintiff the affirmative right to recreate Defendant's products—and indeed, Defendant's patent rights do not give it authority to grant this affirmative right.

---

[9] The Supreme Court addressed licenses in a patent context in Impression Products, 581 U.S. at 374–77.  The Court affirmed the fundamental principle we hold today, that an authorized sale exhausts the patentholder's rights and bars suit against the downstream user.  Id. at 376.  But the Court also went further: even when patentholder grants a *restricted* license, and the licensee sells items outside the scope of the license, the resulting *unauthorized* sales cannot give rise to a suit against an unsuspecting downstream user because the patent exhaustion doctrine still prohibits such suits.  Id. at 376–77.  This holding may weaken the TransCore rule that a patent "license" is merely a covenant not to sue, but it underscores our conclusion that the License Disclaimer did not remove downstream users from the Covenant's protections.

[10] In the Agreement, the parties did not concede liability or conclude whether Plaintiff's actions constituted patent infringement.  That question is not before us, and we do not determine the extent of Defendant's right to exclude Plaintiff before the parties entered the Agreement.

We thus conclude that the Agreement's plain language unambiguously prohibits Defendant from suing Plaintiff for infringement of the Patent Rights when Plaintiff sells or leases its equipment.  The Agreement language does not expressly prohibit Defendant from suing Plaintiff's downstream users for infringement of the Patent Rights.  But the Agreement's additional broad terms ("otherwise engage"), its contemplation of downstream users (assuring the public that Plaintiff can sell and lease its equipment), and its absence of curbing third party protections reasonably supports an interpretation that would protect downstream users.  In this situation— when a patentholder unconditionally covenants not to sue and thus authorizes sales— the patent exhaustion doctrine operates by law to protect downstream users.[11]

Under the Patent Act, patentees generally hold the "right to exclude others from making, using, offering for sale, or selling their inventions."  Impression Prods., 581 U.S. at 370 (quoting 35 U.S.C. § 154(a)) (cleaned up).  But the patent exhaustion doctrine limits the right to exclude.  Id. (citing Bloomer v. McQuewan, 14 How. 539 (1852)).  Under this doctrine, "the initial authorized sale of a patented item terminates all patent rights to that item."  Keurig, Inc. v. Sturm Foods, Inc., 732 F.3d

---

[11] Defendant argues Plaintiff waived consideration of the patent exhaustion doctrine by failing to adequately argue it to the district court.  But both parties argued at length as to the doctrine's application in briefings for the First MSJ.  The district court extensively analyzed the doctrine and provided a legal ruling on it in the First Order.  Plaintiff continued to press the issue on appeal.  So no waiver or forfeiture occurred.  See VDARE Found. v. City of Colo. Springs, 11 F.4th 1151, 1169 (10th Cir. 2021) (quoting Tesone v. Empire Mktg. Strategies, 942 F.3d 979, 991–92 (10th Cir. 2019) (holding waiver occurs only when a party intentionally abandons an issue, and forfeiture doesn't apply when the district court "explicitly considers and resolves an issue of law on the merits").

1370, 1373 (Fed. Cir. 2013) (quoting Quanta Computer, Inc. v. LG Elecs., Inc., 553 U.S. 625, 638 (2008)).  The doctrine recognizes that a patentholder receives full value for a patented item at the time of its first sale, and for this reason the doctrine restricts a patentholder's right to control downstream use of a patented item.  Id. (citing Princo Corp. v. ITC, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc)).

The patent exhaustion doctrine is the brooding omnipresence in the sky of patent law; where parties have not specifically contracted it away, it remains.  This restriction "functions automatically" upon the first authorized sale and forbids lawsuits against downstream users for patent infringement.  Impression Prods., 581 U.S. at 370 (quoting Bloomer, 55 U.S. at 549).  And the restriction applies regardless of whether the patentholder expressly agreed not to sue the downstream user.  See TransCore, 563 F.3d at 1277 (citing Quanta, 553 U.S. at 637).  For example, when a patentholder manufactures and sells a patented item, it cannot then sue the buyer for patent infringement.  See Impression Prods., 581 U.S. at 376.  And if the patentholder contractually allows another party to sell the item and the party does so—in compliance with the agreement—the patentholder cannot sue that buyer for patent infringement either.  See id.  In sum, patent exhaustion prohibits a patentholder from suing downstream buyers when the seller had authority to sell the item.[12]  TransCore, 563 F.3d at 1276.

---

[12] The parties represent that KVA was not a buyer of Plaintiff's equipment but a different kind of downstream user.  Plaintiff asserts—and Defendant does not dispute—that the patent exhaustion doctrine applies equally to a lease (or other type of downstream transfer) as it would to a sale.  Federal Circuit precedent supports this

16

Often, downstream users invoke the patent exhaustion doctrine as an affirmative defense against suit by a patentholder. E.g., Keurig, 732 F.3d at 1373 (citing ExcelStor Tech., Inc. v. Papst Licensing GMBH & Co. KG, 541 F.3d 1373, 1376 (Fed. Cir. 2008)). But the doctrine can also inform the scope of a covenant not to sue.[13] TransCore, 563 F.3d at 1274. If a patentholder promises not to sue an entity for patent infringement when the entity sells items, the doctrine recognizes an inherent promise not to sue downstream users of those items. Quanta, 553 U.S. at 637 (holding that an unconditional covenant not to sue implicates patent exhaustion protections). This is a logical result: the covenant gives the recipient authority to sell an item, and a resulting authorized sale automatically exhausts the patentholder's rights and prohibits suit against the buyer. Absent application of the patent exhaustion doctrine protecting downstream users, covenants not to sue that authorize sales would be illusory because no reasonable customer would want to purchase and use a patented item from an authorized seller.

An exception to this application of the patent exhaustion doctrine occurs when a covenant not to sue is conditional. If the covenant expressly carves out the right to

_____

result in a patent context. NTP, Inc. v. Rsch. In Motion, Ltd., 418 F.3d 1282, 1319 (Fed. Cir. 2005) (holding actual *use* dispositive, regardless of the type of transfer). Thus, we analyze the doctrine using the term "sale" and apply our conclusion to KVA's downstream use.

[13] Defendant argues otherwise, citing Google Inc. v. Beneficial Innovations, Inc., No. 2:11-CV-229-JRG-RSP, 2014 WL 186016, at *3 (E.D. Tex. Jan. 16, 2014). But Defendant fails to convince us that Colorado courts would find Defendant's argument persuasive in place of compelling analysis and holdings from the Federal Circuit.

sell or disclaims third party protections, the patent exhaustion doctrine might not apply—in which case the covenant would likely not prohibit suit against downstream users. See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc., 421 F.3d 1307, 1317 (Fed. Cir. 2005) (citing MAI Sys. Corp. v. Peak Comput., Inc., 991 F.2d 511, 517 (9th Cir. 1993)); cf. Impression Prods., 581 U.S. at 376–77 (applying the patent exhaustion doctrine to prohibit suit against third parties even when a license limited third parties' rights to use the patented items). But if the covenant not to sue either affirms these rights or simply does not mention them, the covenant (1) authorizes sales and (2) extends to downstream users the same protection from suit. See id. (extending protection to third-party users in the absence of any express disclaimer of such protection). Parol evidence of the parties' intent as to downstream application is irrelevant. See TransCore, 563 F.3d at 1277 (citing Quanta, 553 U.S. at 637).

Defendant contends a covenant not to sue cannot protect downstream users under the patent exhaustion doctrine unless it expressly affirms this protection. For support, Defendant relies on Janssen Pharmaceutica v. Apotex, Inc., 540 F.3d 1353, 1363 (Fed. Cir. 2008), in which the covenant not to sue expressly covered downstream users. But Janssen is distinguishable because the court there relied solely on the express contract language and never considered or analyzed the patent exhaustion doctrine. In contrast, when a covenant *doesn't* include such a mention, TransCore answers the question definitively.

18

Under TransCore, 563 F.3d at 1274, when an agreement contains an unconditional covenant not to sue, the covenant grants the recipient the right to make, use, *and sell* the patented inventions—and a resulting authorized sale exhausts the patentholder's right to exclude. Applying the TransCore rule to the present situation, the Covenant grants Plaintiff an unconditional covenant not to sue for infringement of the Patent Rights and does not carve out—but rather affirms—third party protections. So, in this case, Plaintiff's resulting authorized sales or leases exhausted Defendant's right to exclude use of that equipment and Defendant lacked the legal right to sue KVA for infringement of the Patent Rights based on its use of Plaintiff's equipment.

In conclusion, Plaintiff had authority to lease or otherwise transfer its equipment for KVA to use. When it did so, the transfer exhausted Defendant's patent rights such that it could not sue KVA for infringement of the Patent Rights. The district court, therefore, did not err when it found that the Covenant authorized Plaintiff to sell and lease its equipment, and that the patent exhaustion doctrine extends the Covenant to prohibit suit against downstream users.

## IV.

We must next determine the scope of the Patent Rights: specifically, whether the Patent Rights cover the 567 Patent. In its Second Order, the district court found the relevant provision ambiguous and referred to the jury the question of whether the Patent Rights include the 567 Patent. The jury found they did. Defendant contends

19

the district court erred by finding ambiguity and asks us to conclude that the Patent

Rights unambiguously do *not* include the 567 Patent.

An unambiguous provision is "not open to more than one interpretation."  See

Lake Durango Water Co. v. Pub. Utilities Comm'n, 67 P.3d 12, 20 (Colo. 2003), as

modified on denial of reh'g (Apr. 28, 2003).  So, for us to reverse as Defendant asks,

we must find that Defendant's interpretation of the Patent Rights provision is the *only*

reasonable interpretation.  See E. Ridge, 109 P.3d at 974 ("[A] contract is ambiguous

'if it is fairly susceptible to more than one interpretation.'" (quoting Dorman, 914

P.2d at 912).  But if Plaintiff's interpretation is reasonable, then Defendant's

interpretation is not the only reasonable interpretation, and we must reject

Defendant's argument that the Patent Rights unambiguously exclude the 567 Patent.

Because we review a determination of ambiguity, we conduct a de novo review.[14]

See Sanpete, 226 F.3d at 1178 (citing Bank of Okla., 972 F.2d at 1171).

We begin with a brief explanation of relevant patent terms.  A patent's

effective filing date is generally the date on which the United States Patent and

Trademark Office received the application.  35 U.S.C. § 111(a)(4).  But a patent can

effectively obtain an earlier filing date—gaining significant benefits in patent

coverage—by claiming priority to an earlier-filed patent.  Id. §§ 119–20, 365, 386.

By rough analogy, this practice is similar to when one person holds a place in line

and a relative arrives later and joins her, enjoying the preferable position.  Similarly,

---

[14] Defendant does not ask us to review the jury finding, which would require a more deferential standard of review.

a later-filed patent that claims priority to an earlier patent can reach back in time and receive the advantages of the earlier filing date.  Id.  This practice gives rise to a familial relationship: when one or more patents claim priority to another patent, the interrelated patents reside within the same "patent family."  See Blue Gentian, LLC v. Tristar Prods., Inc., 70 F.4th 1351, 1361 n.3 (Fed. Cir. 2023).

The patents at issue here reside within the same patent family.  The 567 Patent does not claim priority to any other patent, so its effective filing date is its actual filing date: February 16, 2010.  Defendant filed the U.S. Patents between 2011 and 2018, but they all claim priority to the 567 Patent, so their effective filing dates are also February 16, 2010.  Thus the 567 Patent and the three U.S. Patents all reside within the same patent family.  Fig. 1.



Figure 1.

As we determined above, in the Covenant, Defendant promised not to sue Plaintiff or downstream users for infringing on the Patent Rights.  The Patent Rights include "any foreign patent related through priority claims to the [U.S. Patents]."  The parties dispute the meaning of the words "related through priority claims to."  The critical question is whether the Patent Rights include the 567 Patent.

Defendant argues that the Patent Rights describe a one-way street and encompass only later-filed foreign patents that reach back in time and assert their own priority claim to one of the U.S. Patents.  We can state Defendant's interpretation more clearly as including "any foreign patent *that claims priority to* the U.S. Patents"—or, "any foreign patent that is related to the U.S. Patents through *its own priority claim* to one of the US Patents."  Because the 567 Patent does not reach backward and claim priority to the U.S. Patents, Defendant claims the Patent Rights *exclude* the 567 Patent.

On the other hand, Plaintiff argues that the Patent Rights describe a two-way street and capture any foreign patent within the same patent family as the U.S. Patents—whether the foreign patent claims priority to the U.S. Patents or vice versa. In other words, Patent Rights includes "any foreign patent related to the U.S. Patents through a priority claim between it and one of the U.S. Patents"—or, "any foreign patent that has a defined relationship to the U.S. Patents by means of a priority claim."  The U.S. Patents reach backward and claim priority to the 567 Patent; as a result, the 567 Patent and the U.S. Patents share a defined familial relationship.  So Plaintiff's interpretation of the Patent Rights includes the 567 Patent.

We conclude that Plaintiff offers the better interpretation of the contract. The dictionary definition of "related" clarifies the meaning of the disputed phrase. "Related" means "to show or establish logical or causal connection between," and in that context always involves a connection that flows between at least two things— whether people, items, or concepts.  Relate, MERRIAM-WEBSTER ONLINE

DICTIONARY, https://www.merriam-webster.com/dictionary/relate (last visited July 23, 2024); Related, CAMBRIDGE DICTIONARY ONLINE, https://dictionary.cambridge.org/dictionary/english/related (last visited July 23, 2024) ("belong[ing] to the same family").  Our research has turned up no dictionary definition stating that this connection flows only one direction.  In other words, when A is related to B, B is also necessarily related to A.  Plaintiff's interpretation follows this common usage because Plaintiff interprets the disputed phrase—"any foreign patent related through priority claims to [the U.S. Patents]"—as a connection that can flow either direction between the 567 Patent (which is a foreign patent) and the U.S. Patents, and as a reference to patents within a patent family.  Plaintiff's interpretation is reasonable because it gives meaning to each part of the phrase and employs the plain meaning of the words and phrases under ordinary usage.

Ordinary grammar also supports the reasonableness of Plaintiff's interpretation.[15]  The disputed phrase contains two prepositions: "through" and "to."

---

[15] Colorado courts must consider grammar rules when determining the plain meaning of *statutes*.  McCoy v. People, 442 P.3d 379, 389 (Colo. 2019).  In contrast, Colorado does not expressly require courts to consider grammar rules when construing *contracts*, but merely requires that courts determine the parties' intent from the "plain, popular, and generally accepted meaning of the words employed.'"  Wota, 831 P.2d at 1309 (quoting Heller, 800 P.2d at 1008).  The Tenth Circuit cautiously considers grammar rules in contract construction, but only if it helps clarify the parties' intent, and with a strong dose of common sense; we avoid rigidity because we understand that contracting parties often break grammar rules.  Payless Shoesource, Inc. v. Travelers Companies, Inc., 585 F.3d 1366, 1371 (10th Cir. 2009) (quoting Link, Inc. v. City of Hays, 972 P.2d 753, 758 (Kan. 1999)).  We consider grammar rules here in that vein: as a flexible tool that can give insight into the parties' intent and enlighten the "plain, popular, and generally accepted meaning of the words employed"—unless context shows otherwise.  See Wota, 831 P.2d at 1309.

A preposition expresses a relation between its object and another word.  Preposition, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/preposition_n (last visited July 23, 2024).  A preposition and its object—usually the word directly following it—comprise a prepositional phrase.  Id.; BRYAN GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE, 233 (W. Acad. Publ'g, 4th ed. 2018).  These phrases function as modifiers—adjectives or adverbs.  Id.

In Plaintiff's interpretation of the disputed phrase, the prepositional phrases "through priority claims" and "to the U.S. Patents" both function as adverbs to modify and limit the preceding adjective, "related," which in turn describes the preceding noun phrase, "any foreign patent."  In this manner, each preposition expresses the relation between its object and the word "related."  Thus, the Patent Rights include all foreign patents that are related to the U.S. Patents, but only if a priority claim created the relationship.

The 567 Patent shares a relationship with the U.S. Patents because it resides in the same patent family.  A priority claim created the relationship—specifically, the U.S. Patents' priority claims to the 567 Patent.  So, under Plaintiff's reasonable interpretation, the Patent Rights include the 567 Patent.  Common usage and ordinary grammar constructs support this interpretation, and context does not indicate a contrary meaning.

Defendant advances two arguments for why this interpretation is not reasonable, but they lack merit.  First, Defendant contends that the term "priority

24

claims to" has a technical meaning that precludes Plaintiffs' interpretation.[16]  See

People ex rel. Rein v. Jacobs, 465 P.3d 1, 11 (Colo. 2020) (quoting Bledsoe Land Co.

v. Forest Oil Corp., 277 P.3d 838, 843 (Colo. App. 2011); Flying J Inc. v. Comdata

Network, Inc., 405 F.3d 821, 833–34 (10th Cir. 2005)) (applying the technical

meaning of technical terms and words of art).  Defendant lists nearly a dozen district

court cases that interpret language including the phrase "priority claim to" or

"priority claims to" as a one-way street in which the first-listed patent must claim

priority to the second patent.  But each of these cases interprets the syntax "[X

patent's] priority claim to [Y patent]."  Unlike the Agreement language, this syntax

includes a possessive form of the first patent.  So the phrase designates only one

priority claim: the priority that X patent claims by reaching backward to an earlier-

filed Y patent.  In other words, the priority claim must belong to X patent and not to

Y patent.  None of Defendant's cited cases include the language "related to" or

"related through" like the Agreement.  So these cases are distinguishable and do not

suggest that "related through priority claims to" requires a one-way street.

Second, Defendant argues we should apply the last antecedent rule to discern

the meaning of the prepositional phrases.  See Chandler-McPhail v. Duffey, 194 P.3d

434, 441 (Colo. App. 2008) (considering the last antecedent rule as a flexible tool to

---

[16] Defendant states that Plaintiff's position "requires the original phrase, 'any foreign patent related through priority claims to the '662 patent, the '906 patent, or the '340 application,' to be entirely rewritten as 'any foreign patent related to the '662 patent, the '906 patent, or the '340 application through priority claims' . . ."  Despite Defendant's contentions, these apparently "completely rewritten" sentences seem to us little different than "He ate the soup slowly" and "He slowly ate the soup."

help discern the parties' intent in contract interpretation).  Under this rule, a phrase

modifies and limits *only* the immediately preceding phrase and not previous phrases,

unless the language and context show the parties' intent otherwise.  Id.  Colorado

long ago repudiated the last antecedent rule in the context of statutory interpretation,

but Colorado courts have continued to apply it—with caution—to construe contract

terms.[17]  Id.



Figure 2.

Figure 3.

Defendant invokes this rule to argue that only the phrase "priority claims to"

can modify "the [U.S. Patents]," and that "related through" does not modify "the

[U.S. Patents]."  Fig. 2.  This argument turns the last-antecedent rule on its head and

does not create a logical meaning.  Assuming arguendo that Defendant intended to

argue the reverse—that the phrase "the [U.S. Patents]" modifies only "priority claims

---

[17] We are uncertain whether Colorado would apply the last-antecedent rule *before* finding a contract provision ambiguous.  See Jordan v. Maxim Healthcare Servs., Inc., 950 F.3d 724, 732 (10th Cir. 2020) (quoting Specialty Rests. Corp. v. Nelson, 231 P.3d 393, 397 (Colo. 2010)) (citing Rags Over the Ark. River, Inc. v. Colo. Parks & Wildlife Bd., 360 P.3d 186, 192 (Colo. App. 2015); City & Cty. of Denver v. Expedia, Inc., 405 P.3d 1128, 1132 (Colo. 2017)) (holding under Colorado law, canons of construction apply only to ambiguous *statutory* provisions); see also Payless Shoesource, Inc. v. Travelers Companies, Inc., 569 F. Supp. 2d 1189, 1197 (D. Kan. 2008), aff'd, 585 F.3d 1366 (10th Cir. 2009) (holding last antecedent rule applies only after finding of ambiguity).  Because we conclude the rule does not affect the meaning of the disputed phrase, we need not decide this question.

to" and not "related through"—this parsing chops up phrases unnaturally.  Fig. 3.  As Plaintiff argues, the last-antecedent rule could easily mean that the phrase "through priority claims" modifies the word "related"—as Plaintiff argues.  Fig. 4.  And the context shows that we can reasonably interpret both prepositional phrases as modifying the antecedent verb "related."  Id.  So the last-antecedent rule—even if we give it any weight—does not require Defendant's interpretation or preclude Plaintiff's interpretation.  Thus Plaintiff's interpretation remains reasonable.



Figure 4.

The disputed phrase in the Patent Rights provision—"any foreign patent related through priority claims to [the U.S. Patents]"—can reasonably include the 567 Patent.  So, the district court did not err in refusing to find that the Patent Rights unambiguously exclude the 567 Patent.

V.

For the foregoing reasons, the district court correctly found that the Agreement

27

includes protection for downstream users against patent infringement suits under the

patent exhaustion doctrine and covers the 567 Patent in its Patent Rights section.


    AFFIRMED. [18]

---

[18] In a supplemental brief, Defendant presents a contingent argument: in the event we reverse in whole or in part, Plaintiff would no longer be the prevailing party and the Agreement would not entitle Plaintiff to recover attorney's fees. Defendant presents no argument that we should consider the issue if we affirm. We affirm, so we do not disturb the district court's award of attorney's fees.